**HUMANE SOCIETY OF THE UNITED STATES, et al., Appellants,**

v.

**Donald P. HODEL, Secretary of Interior, et al.**

**No. 87–5095.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1987.

Decided Feb. 16, 1988.

As Amended Feb. 24, 1988.

46

David J. Hayes, with whom David F. Grady and Craig A. Hoover, Washington, D.C., were on the brief, for appellants.

Dirk D. Snel, Atty., Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., and Martin W. Matzen, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees, Dept. of Justice and Dept. of Interior.

Paul A. Lenzini, with whom Luisa L. Lancetti, Washington, D.C., was on the brief for appellee, Intern. Ass'n of Fish and Wildlife Agencies.

C. King Mallory III, James F. Bowe, Jr. and Deborah S. Colby, Washington, D.C., were on the brief for appellee, Wildlife Legislative Fund of America, Inc.

Before WALD, Chief Judge, BORK,

Circuit Judge,[*] and GIBSON,[**] Circuit Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This appeal arises from a challenge lodged principally by the Humane Society of the United States ("HSUS" or "the Society") to a series of actions by the United States Fish and Wildlife Service ("the Wildlife Service" or "the Service") allowing hunting on some of America's national wildlife refuges. The Society, joined by one of its members, Roger Kindler, alleged that in sanctioning hunting, the Wildlife Service was violating four federal environmental statutes: the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4331 *et seq.;* the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531 *et seq.;* the Refuge Recreation Act of 1962 (RRA), 16 U.S.C. §§ 460k *et seq.;* and its companion enactment, the National Wildlife Refuge System Administrative Procedure Act (NWRSAPA), 16 U.S.C. § 668dd. The Society and Kindler sought declaratory and injunctive relief to prevent such hunting.

On cross-motions for summary judgment, the district court held that the Humane Society had no standing to bring this action and that Kindler had standing only to challenge NEPA violations occurring on the Virginia island of Chincoteague, the single refuge he had visited. The court reached this conclusion through a process of elimination. It first discounted some injuries described by HSUS and by Kindler as constitutionally noncognizable "emotional" injuries. It then characterized the remaining claims as involving injuries to "recreational interests" that fell outside the zone of interests protected by ESA and the two Refuge Acts. Finally, with respect to the remaining NEPA claims, the court held that the Humane Society had failed to satisfy the Supreme Court's requirements for associational standing because the "recreational" interest of Society members which the Society sought to vindicate in this action was not germane to the group's self-described mission of insuring the humane treatment of animals and other wildlife. That left one merits issue which Kindler was allowed to raise: whether the Wildlife Service had complied with NEPA in allowing a hunt opening at the Chincoteague site. The district court held that it had.

For reasons we enumerate, we reverse the district court's finding that the Humane Society had no standing to challenge the hunt openings, and remand to allow HSUS to pursue its challenge under all four statutes to the introduction of hunting. We affirm, however, the district court's finding on the merits that the Wildlife Service complied with NEPA when it permitted hunting at the Chincoteague preserve.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

America's network of national wildlife refuges dates back to 1903. In that year, President Theodore Roosevelt, acting in response to public concern about the killing of pelicans, herons, egrets, ibises, spoonbills and other water birds for the millinery trade, issued an executive order designating Florida's three-acre Pelican Island as a sanctuary where such fowl could not be killed. By the time Roosevelt left office in 1909, he had issued executive orders setting aside some 50 other preserves around the country for the enhancement and protection of wildlife ranging from migratory waterfowl to large mammals such as elks and bisons.

America today has more than 400 national wildlife refuges in 49 states and 5 trust territories. Together they cover nearly 90 million acres. Many were created in a manner akin to that first used by Roosevelt: by unilateral executive orders

---

[*] Circuit Judge Bork was a member of the panel that heard this appeal but did not participate in the decision.

[**] Of the United States Court of Appeals for the Eighth Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

providing for land withdrawals. Others emerged through statutorily-authorized land purchases. Most recent refuges have stemmed from congressional legislation setting aside certain areas as preserves.

Although at first blush it might seem Orwellian to permit hunting in areas styled as wildlife "refuges," some of these executive and legislative measures creating refuges expressly left room for limited sport hunting. The most restrictive refuges have been those created expressly pursuant to the 1929 Migratory Bird Conservation Act (MBCA), 45 Stat. 1222, 1224 (1929), which flatly barred hunting of birds on certain lands. By contrast, other orders, not referring to the MBCA, have contained provisions generally prohibiting the taking of wildlife "except under such rules as may be promulgated by the appropriate Secretary." *See, e.g.,* E.O. 8067 (Mar. 17, 1934); E.O. 8037 (Jan. 18, 1939); *see also* E.O. 2416 (July 25, 1940) (prohibiting the hunting, trapping or killing of birds or wild animals on 193 refuges "except as permitted by law or by rules and regulations of the Secretary of the Interior"). Similarly, some refuges created by land purchases were funded through enactments like the Duck Stamp Act of 1934, 48 Stat. 451, which as amended in 1958 allows public waterfowl hunting on 40% of the land. Finally, on a number of refuges created by federal legislation Congress has specifically authorized limited hunting of certain species.

In addition to these orders and enactments governing specific preserves, four broader federal environmental statutes, all invoked by the Humane Society in this legislation, provide standards generally relevant to the permissible scope of hunting on wildlife refuges:

(1) The Refuge Recreation Act of 1962 attempts to reconcile "mounting public demands for recreational opportunities" within the refuge system with that system's conservationist purposes. *See* 16 U.S.C. § 460k. Toward this end, it forbids using refuges for forms of recreation "not directly related to the primary purposes and functions of the individual areas until the Secretary shall have determined ... that such recreational use will not interfere with the primary purposes for which the areas were established." *Id.* It authorizes public recreation only when, in the judgment of the Secretary of the Interior, such recreation "can be an appropriate incidental or secondary use." *Id.*

(2) The National Wildlife Refuge System Administration Act of 1966 broadly sets forth organizational and financial practices governing the refuge system. The subsection pertinent to this litigation authorizes the Secretary of the Interior to "permit the use of any area within the System for any purpose, including but not limited to hunting, fishing, public recreation and accommodations ... whenever he determines that such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. § 668dd(d)(1)(A). It limits hunting of migratory game birds to 40% of the territory within each refuge, "unless the Secretary finds that the taking of any species of migratory game birds in more than 40 percent of such area would be beneficial to the species." *Id.*

(3) The National Environmental Policy Act of 1969, the broadest enactment in scope, requires in pertinent part that every proposed federal action "significantly affecting the quality of the human environment" be prefaced by a detailed "environmental impact statement" taking into account certain conditions and factors. 42 U.S.C. § 4332(C).

(4) The Endangered Species Act of 1973 sets forth procedures for preserving designated threatened or endangered species and requires, subject to certain exceptions, *see* 16 U.S.C. § 1539, the Secretary to take such actions "necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). It also prohibits a series of acts deemed threatening to those species. 16 U.S.C. § 1538.

## B. *This Litigation*

On November 29, 1984, the Humane Society, a national animal and bird welfare organization claiming 75,000 dues-paying members, filed suit against William P.

Clark, the then-Secretary of the Interior, and Robert A. Jantzen, the Director of the Wildlife Service. In this endeavor the Society was joined by Roger A. Kindler, a Humane Society member residing in Washington, D.C.

The essence of the Humane Society's complaint was that in the preceding few months, "an extraordinary number of wildlife refuges have been opened for the first time to hunting or have had the scope of hunting greatly expanded." *See* HSUS Complaint at ¶ 18. The Society's complaint stated that on June 1, 1984, nine refuges had been opened for migratory bird hunting, upland game hunting and/or big game hunting, *see id.* (citing 49 Fed.Reg. 22819 (1984)), and that on September 21, 1984, another 13 refuges were opened to similar activities. *See id.* (citing 49 Fed.Reg. 37093 (1984)). The Society alleged that these actions violated NEPA, ESA and the two Refuge Acts. In particular, it asserted that the Wildlife Service had opened new refuges to hunting without completing the analyses required to ensure such hunting was compatible with the purposes for which each preserve had been designated, that the Service had unlawfully adopted new procedures foregoing annual evaluations of the impact of sport hunting, and that it had failed to prepare environmental impact statements. The Society sought both declaratory and injunctive relief, asking that the Service be enjoined from opening up refuges to hunting until it completed adequate evaluations of the compatibility of hunting with the refuges' functions and the requisite statutory environmental analyses.[1]

In defense, the Wildlife Service argued principally that HSUS had no standing to bring suit, and that in allowing various hunt openings the wildlife agency had fully complied with the four environmental statutes.[2] Toward this latter end, it argued that no significant change in the operation of the refuges constituting a "major federal action" had occurred and thus that the Service had no duty to prepare an EIS. It further stated that, in any event, the agency was in the process of preparing a new programmatic EIS. The Service also contended that it had complied with the strictures of each act designed to ensure compatibility with the acts' protective purposes.

On cross-motions for summary judgment, the district court ruled that the Humane Society lacked standing to press these challenges. *See Humane Society of the United States v. Clark,* C.A. No. 84–3630, slip op. (D.D.C. July 25, 1986) (hereinafter "District Court Opinion"). In reaching this conclusion, the court first held that Kindler's and HSUS' claims (on behalf of its members) that they suffered from the knowledge that animals in the reserves were being killed and maimed amounted to no more than "emotional distress at the knowledge that animals and birds are being hunted for sport" and thus did not present a cognizable injury on which to ground standing, under *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) (rejecting as an inadequate basis for standing distress suffered as a "psychological consequence presumably produced by observation of conduct with which one disagrees"). *See* District Court Opinion at 11–12.

---

1. The Society also requested declaratory and injunctive relief requiring the defendants to complete annual evaluations of the compatibility of hunting on refuges where hunting is permitted; to issue annual refuge-specific hunting restrictions; to determine that specific funds are available for the proposed hunting activities; to cease delegating authority to administer hunting to state governments; and to provide meaningful public participation in connection with its decisions to allow hunting on various preserves.

2. In addition to these two primary lines of defense, the Wildlife Service argued (1) that procedural revisions adopted by the Service in 1984 guarantee annual compatibility reviews of hunting plans and therefore render moot plaintiffs' claims based upon the two Refuge Acts; and (2) that plaintiffs' ESA claims should be dismissed because plaintiffs failed to provide 60 days notice to the Secretary of the Interior before filing suit, as is required by § 11(g) of the Act.

The court held that the plaintiffs' remaining interest in what it termed the "recreational" use of the preserves, did not appear "to be within the zone-of-interests protected by ESA or the Refuge Acts." It reasoned that "[t]he purposes of neither ESA nor the Refuge Acts include protection of anyone's recreational rights. The Refuge Acts ... do not protect anyone's right to use the refuges for recreation. In fact, the Refuge Acts carefully *restrict* the right to use refuges for recreational purposes." *Id.* at 12.

Finally, with respect to the plaintiffs' remaining claimed injuries, those stemming from impinged recreational rights under NEPA, the district court held that the Humane Society failed the second prong of the three-prong test set forth in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed. 2d 383 (1977), for associational standing: that the interests the organization seeks to protect be germane to the organization's purpose.[3] The court wrote:

> Here, the interest the Humane Society seeks to protect is its members' right to use the refuges for recreational purposes. However, protecting such rights is not a purpose of the Society. Its uncontradicted purpose is to ensure the humane treatment of animals. The Humane Society's purposes, unlike those of many other organizations which have asserted their members' recreational rights, e.g. Sierra Club, just do not include protection of its members' recreational rights.

*See* District Court Opinion at 12–13.

That series of standing decisions left intact only those claims based on the NEPA statute pressed by HSUS member Kindler.[4] These claims were that the Service had failed to prepare or update EIS's for various refuges and that it had further failed to prepare an updated programmatic EIS for the refuge system as a whole. The court granted summary judgment to the Wildlife Service on both claims.

With respect to Kindler's programmatic EIS claim, the district court observed that each of the Service's previous programmatic EIS's, the last of which had been issued in 1976, had been upheld against NEPA challenge, and that the Service was presently preparing three new programmatic EIS's. *Id.* at 15. The district court, noting the six-year statute of limitations governing NEPA claims, also granted summary judgment to the Service on all of Kindler's site-specific claims contesting pre–1980 hunt openings where Kindler had failed to show that the Service had initiated a new hunting program or modified an existing one so as to constitute a "major federal action" within the meaning of that NEPA requirement. *Id.* at 15–17. As for post–1980 hunt openings, the court held, in a supplementary opinion issued after granting Kindler the opportunity to identify such openings, that Kindler had standing to challenge hunting only at Chincoteague, the one refuge he had visited. *See Humane Society v. Clark*, C.A. No. 84–3630, mem. op. (D.D.C. Jan. 27, 1987) (hereinafter "District Court Opinion II"). It reasoned that Kindler had suffered no cognizable injury, but rather only emotional distress, at sites he had not visited. Finally, the court concluded that the Service had not acted arbitrarily and capriciously in not issuing an EIS at Chincoteague. Finding reasonable the agency's conclusion that allowing bird hunting on one portion of Chincoteague threatened "no significant impact," the court held that under NEPA a

---

3. The other two prongs of the *Hunt* test require that the organization's members have standing to sue in their own right and that the participation of these individual members is not required by the claim asserted or the relief requested. *See infra*, at 53.

4. The district court rejected the Service's argument that the Society's Refuge Act claims were moot, *see* note 2, *supra*, by noting that parties seeking to prove mootness shoulder a "heavy burden," and that a "well-recognized exception [exists] to the mootness doctrine for short-term orders that are 'capable of repetition yet evading review.'" District Court Opinion at 13 (citations omitted). Because the court had concluded that the claims based on the Endangered Species Act fell outside of that statute's zone of interests, it did not address defendants' additional defense based on ESA's 60–day notice requirement.

mere "environmental assessment," less comprehensive than an EIS, was legally sufficient. *Id.* at 8–12. Accordingly, the court granted summary judgment to the Service on the merits of Kindler's claim with respect to Chincoteague. This appeal followed.

## II. STANDING

### A. *Constitutional Dimensions*

■ In *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court described the standing requirement emanating from the "case or controversy" limitation of Article III of the Constitution as containing three distinct demands:

> [A]t an irreducible minimum, Art. III requires the party who invokes the Court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and is "likely to be redressed by a favorable decision." In this manner does Art. III limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process."

*Id.* at 472, 102 S.Ct. at 758 (citations and footnote omitted). The standing controversy in this case, at least insofar as its constitutional dimensions are concerned, turns on whether the first prong of this tripartite analysis, that of injury-in-fact has been satisfied.[5] That analysis in turn involves two separate inquiries: (1) whether the injuries alleged by plaintiffs here are constitutionally cognizable ones; and (2) if so, whether the Humane Society is qualified to press those claims under the Supreme Court's test for representational standing.

1. *The Adequacy of the Alleged Injuries*

The Humane Society has alleged that allowing hunting on wildlife refuges injures its members in two respects. First, "HSUS and its members have demonstrated a strong interest in the preservation, enhancement and humanitarian treatment of wildlife that the National Wildlife Refuge System was designed to protect." Second, "[m]any HSUS members utilize the refuge system for recreational purposes, including the observation of wildlife protected by the refuges, and the killing and maiming of such wildlife severely impacts on these activities." Complaint of HSUS at ¶ 5. The 18 affidavits of Humane Society members offered in support of these interests, *see* Joint Appendix ("J.A.") at 142–98, lend credence to these organizational self-descriptions.

■ The first of these injuries, to members' "strong interest" in the enforcement of the Refuge and environmental laws, is an inadequate basis on which to ground standing. "[A]n asserted right to have the government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *See Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984); *see also Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 222–23, 94

---

5. The requirement of fair traceability, or causation, is readily satisfied in this case: the killing of refuge-dwelling animals directly stems from the Wildlife Service actions authorizing hunting of such prey. It is no defense to suggest that the presence of autonomous intervening agents in the form of the hunters defeats plaintiffs' standing to mount such a challenge. "The Supreme Court's decisions on this point show that mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice." *National Wildlife Federation v. Hodel*, 839 F.2d 694, 705–06 (D.C.Cir.1988) (citing, *inter alia, Meese v. Keene*, ─── U.S. ───, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). The redressability inquiry in this case melds into that of causation, as it so often does in cases where the relief sought is merely the cessation of illegal conduct. *See Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

S.Ct. 2925, 2932–33, 41 L.Ed.2d 706 (1974) (rejecting claim of "citizen standing" and stating that "[t]o permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse in the judicial process"). Nor can the sincerity of Society members' commitment to the enforcement of laws protecting wildlife compensate for the lack of a concrete stake. "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge*, 454 U.S. at 486, 102 S.Ct. at 766. As the Supreme Court reiterated only last Term:

> 'The exercise of judicial power ... can so profoundly affect the lives, liberty and property of those to whom it extends,' *Valley Forge*, 454 U.S. at 473 [102 S.Ct. at 759], that the decision to seek review must be placed 'in the hands of those who have a direct stake in the outcome.' *Sierra Club v. Morton*, 405 U.S. 727, 740 [92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972)]. It is not to be placed in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interest.' *United States v. SCRAP*, 412 U.S. 669, 687 [93 S.Ct. 2405, 2416, 37 L.Ed.2d 254] (1973).

*Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986) (citations abbreviated). We therefore agree with the district court that what it terms the "mere emotional injuries" in this case are noncognizable.

■ The second injury alleged by the Humane Society, however, is clearly cognizable. The gist of this grievance is that the existence of hunting on wildlife refuges forces Society members to witness animal corpses and environmental degradation, in addition to depleting the supply of animals and birds that refuge visitors seek to view. These are classic aesthetic interests, which have always enjoyed protection under standing analysis.

The leading case on the legitimacy of aesthetic injuries is *Sierra Club*, where the Supreme Court stated: "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." 405 U.S. at 734, 92 S.Ct. at 1366. The Court subsequently reaffirmed this position in *SCRAP*. *See* 412 U.S. at 686, 93 S.Ct. at 2415. Our recent opinion in *National Wildlife Federation v. Hodel*, 839 F.2d 694 (D.C.Cir.1988), holding that a wildlife organization had standing to challenge Interior Department surface-mining regulations that allegedly threatened to degrade the environment, involved injuries strikingly analogous to those involved in this case: There the National Wildlife Federation's standing rested in part on the aesthetic injuries to those members who complained of viewing degraded landscapes, *see id.* at 704, 707, and *passim*, and here the Humane Society's standing similarly rests on the aesthetic injuries to members who complain of viewing the despoliation of animals. *See also Alaska Fish & Wildlife Federation v. Dunkle*, 829 F.2d 933, 937 (9th Cir.1987) (decrease in number of migratory birds "has injured those who wish to hunt, photograph, observe, or carry out scientific studies"). We therefore conclude that both HSUS and Kindler have pleaded aesthetic injuries sufficient to confer standing to challenge hunting on refuges.

### 2. *HSUS's Organizational Standing*

We now turn to the most nettlesome issue in this case: whether the Humane Society has standing as an organization to sue on behalf of its injured members.[6] In *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme

---

6. If the Humane Society is to have standing to sue in this case, it can only be as a representative of its injured members. The Society has neither claimed standing to sue on its own behalf, nor has it alleged, as it must to gain such standing, "a concrete and demonstrable injury to [its] activities." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

Court set forth the following test for organizational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441. The vitality of this test was most recently reaffirmed in *International Union, UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 2528–33, 91 L.Ed.2d 228 (1986), where the Court declined a specific request to reconsider and reject the *Hunt* principles.[7]

Because the Humane Society's members have standing to protest their aesthetic injuries in their own right, and because the declaratory and injunctive relief requested by the Society is clearly not of a type that requires the participation of any individual member,[8] the representational standing issue in this case turns on the second element of the *Hunt* test, the germaneness prong. The district court concluded that the Humane Society had not satisfied this requirement because its organizational purpose, as expressed in its certificate of incorporation, speaks exclusively about the protection of all living things (presumably for

their own intrinsic worth), and says nothing about enhancing enjoyment or observation of these living things by other human beings.[9] *See* District Court Opinion at 12–13. On appeal, the Society argues that this is too parsimonious a reading of the Society's purposes as set out in the certificate, since appreciation of and visual contact with wildlife by members is a necessary predicate in most cases to informed and effective activities by the Society for the protection of animals and birds who cannot fight for themselves in the human world. The Society argues that germaneness was never meant to be a rigid barrier to standing and that the term should be construed broadly in terms of the actual record and the demonstrated interests of the organization. The Wildlife Service counters that an organization's litigation interest should be closely tethered to its stated purpose, something that cannot be said of the "recreational" interest advanced in this litigation by the humanitarian-focused Humane Society.[10]

### a. The Function and Rigor of the Germaneness Test

In appraising the rigor of the germaneness requirement, we venture onto virgin territory. Unlike the injury-in-fact prong of the *Hunt* test, probed in numerous Supreme Court and appellate cases,[11] and un-

---

7. The facts and opinion in *UAW* are discussed *infra* at pp. 55–56 and p. 56 n. 17 of this opinion.

8. *See Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975) (authorizing organizational suits for injunctive and declaratory relief, not individualized damages); *compare UAW* (granting associational standing where union sought legal ruling on validity of agency interpretation of trade law) *with Telecommunications Research & Action Center v. Allnet Communication Services, Inc.*, 806 F.2d 1093 (D.C.Cir.1986) (denying associational standing because plaintiff organization's claim for money damages would ordinarily require individual participation).

9. The Society's certificate of incorporation lists the following as "[t]he objects or purposes to be promoted or carried on":

> 1. To protect all living things, especially animals, children, and the aged, from cruelty

and neglect, with special emphasis on cruelties of national scope;

> 2. To use all means to further humane education in public and private schools, churches, farm groups, and youth organizations, and among the general public, provided, however, that the corporation shall not have the power to organize or conduct a private school;

> 3. To cooperate with all international humane organizations and the humane societies of other nations, in all efforts to prevent or ameliorate suffering.

J.A. at 227.

10. The intervenors go a step further, urging that the Supreme Court actually intended that a litigation interest be *central* to a group's organic purpose—a characterization seemingly belied by the plain meaning of the term "germane."

11. For several recent examples of injury-in-fact analyses undertaken in associational standing cases, *see National Coal Association v. Hodel*,

like the individual-participation prong, directly addressed by this and other courts on several occasions,[12] the parameters of germaneness have never been explored in meaningful detail by either the Supreme Court or by any federal circuit court. Such an inquiry is dispositive here because if the germaneness requirement is meant to perform the considerable screening function suggested by the Wildlife Service and the intervenors, the Humane Society's complaint founders.[13]

Our inquiry naturally begins with *Hunt* itself. In introducing the associational standing test, Chief Justice Burger's opinion suggested that the Court had not developed the three prongs of injury-in-fact, germaneness, and individual participation *sui generis*, but rather that it had distilled each requirement from past cases.[14] Accordingly, it did not labor to elaborate the principles underlying any of the three parts of the doctrine. Yet while the five cases cited in *Hunt* as the basis of this synthesis, *see* 432 U.S. at 343, 97 S.Ct. at 2441, shed considerable light on the first prong of the associational standing test, and elucidate somewhat the third prong, they offer scant guidance on the second prong. None address the issue, critical here, of the relationship a representative group's organic purpose must bear to the types of cases it may bring on behalf of its membership.[15]

---

825 F.2d 523, 526 n. 3 (D.C.Cir.1987); *National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1231–38 (D.C.Cir. 1987); *American Legal Foundation v. Federal Communications Commission,* 808 F.2d 84, 89–91 (D.C.Cir.1987).

**12.** *See, e.g., Telecommunications Research & Action Center v. Allnet Communication Services, Inc.,* 806 F.2d 1093, 1094–97 (D.C.Cir.1986); *Simer v. Rios,* 661 F.2d 655, 682 (7th Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982); *United Steelworkers v. University of Alabama,* 599 F.2d 56, 59 (5th Cir.1979).

**13.** Had the Society's statement of purposes included protecting member activities harmed by decreases in animal and bird populations, as in *Alaska Fish & Wildlife Federation v. Dunkle,* 829 F.2d 933, 938 (9th Cir.1987), or had the Society taken the trouble to join its members as fellow plaintiffs rather than premising the bulk of this suit on its role as a representative of its members, this lengthy inquiry into germaneness would perforce be unnecessary.

**14.** *See* 432 U.S. at 343, 97 S.Ct. at 2441 (*"Thus, we have recognized* that an association has standing to bring suits on behalf of its members when [the three enumerated requirements are met]") (emphasis added).

**15.** The first case cited in *Hunt, Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), turned on the Supreme Court's judgment that the injury-in-fact prong was not satisfied. In concluding that several organizations dedicated to promoting the access of the poor to health services did not have standing to challenge an Internal Revenue Service policy extending favorable tax treatment to hospitals that did not treat indigents, the Court stated that it was "purely speculative" whether the denials of hospital service alleged by the organizations' financially strapped members stemmed from the challenged tax policy at all. *Id.* at 42–43, 96 S.Ct. at 1926.

*Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), also offers guidance only on prong one. In *Meek,* the Court concluded in a brief footnote that the organizational plaintiffs in the case—the American Civil Liberties Union, the National Association for the Advancement of Colored People, the Pennsylvania Jewish Community Relations Council, and Americans United for Separation of Church and State—had standing to challenge a state law providing assistance to private church-affiliated schools under the Establishment Clause of the first amendment. *Id.* at 355–56 n. 5, 95 S.Ct. at 1758 n. 5. The footnote elaborated only that each of the plaintiff groups had members who are taxpayers and thus enjoy the distinctive taxpayer standing under *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), to challenge alleged establishment clause violations.

The third case cited in *Hunt, Sierra Club,* stated in pertinent part that a mere "special interest" in a subject did not empower an organization to bring suit in federal court if it could identify no injured member. *See* 405 U.S. at 739, 92 S.Ct. at 1368. This language merely sketches the same limitation, barring mere ideological injuries, that prevents the society's "emotional" injuries in this case from being cognizable. The case does not purport to address the question of the requisite level of organizational interest in cases where, as here, a member demonstrably suffers a cognizable injury.

*National Motor Freight Traffic Association, Inc. v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963), a paragraph-long opinion explaining a denial of rehearing, states in pertinent part that the plaintiff association of motor carriers was a "proper representative" of individual carriers aggrieved by an Interstate Commerce Commission order. This judgment does go to prong two, but because it is wholly unrela-

Nor do the Court's actions in these five cases amplify its thinking. The three cases denying standing—*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Sierra Club;* and *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)—do so on grounds wholly unrelated to organizational purpose. *See* note 15, *supra.* The two that find standing—*Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and *National Motor Freight Traffic Association, Inc. v. United States*, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963)—involved membership organizations whose litigation postures were not only germane, but involved the very core of their avowed purposes. *Meek* involved an establishment clause challenge by four civil libertarian groups to a parochial-school aid program, and *National Motor Traffic* involved a challenge by an association of motor carriers to an Interstate Commerce Commission ruling imposing direct burdens on motor carriers. The Court's silence in these two cases about organizational germaneness apparently reflects the Justices' belief that it was an easy issue, or even a nonissue.

Nor do the facts of *Hunt* itself shed any more light on the function or formidability of the germaneness requirement. In *Hunt*, the Court held that a state agency established to promote the state's apple industry had standing to represent the interests of apple dealers and growers in challenging as an unconstitutional burden on interstate commerce the highly restrictive regulations on apple marketing imposed by another state. In these circumstances, the Court understandably appeared to regard the germaneness inquiry as a mere formality. Disposing of the issue in a sentence, the Court wrote that the apple commission's attempt to remedy its

members' injuries through litigation was not only germane, but "central to the Commission's purpose of protecting and enhancing the market for Washington apples." 432 U.S. at 344, 97 S.Ct. at 2442.

*UAW v. Brock* provides much more guidance. In *UAW*, the Court turned away a specific request that it reject the existing test for associational standing. That challenge was premised on the theory that the associational standing requirements set forth in *Hunt* inadequately guaranteed proper representation to the interests of association members, particularly when compared to the more stringent requirements guaranteeing adequate representation encoded in Fed.R.Civ.P. 23, governing class action certification. Justice Marshall's opinion for the Court responded by strongly endorsing associational standing. It noted three "special features, advantageous to both the individuals represented and to the judicial system as a whole ... distinguish[ing] suits by associations on behalf of their members from class actions." 106 S.Ct. at 2532. Such organizations (1) "can draw upon a pre-existing reservoir of expertise and capital, ... [possessing] specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack"; (2) attract members whose "primary reason" for joining is "often to create an effective vehicle for vindicating interests that they share with others"; and (3) possess a self-policing mechanism guaranteeing a modicum of fair representation: "[t]he very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests." *Id.* at 2532–33.

■ The Supreme Court's recognition in *UAW* of these special advantages offered

---

borated, *National Motor Freight* offers little guidance.

Finally, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) offers useful guidance on the import of the third prong. It observes, in a passage quoted by the *Hunt* Court, that whether an association "has standing to invoke the Court's remedial powers on behalf of its members depends in substantial measure on

the nature of the relief sought." *Id.* at 515, 95 S.Ct. at 2213. Elaborating, the Court differentiates between declarative and injunctive relief, on the one hand, and monetary relief, on the other, saying nothing about germaneness. The other ramifications of *Warth* for standing focus not on elements particular to associational standing, but rather on the problem of fair traceability, not at issue here.

by association suits signals to us the importance of a reading of the germaneness requirement that does not unduly confine the occasions on which associations may bring legal actions on behalf of members and thus significantly restrict the opportunities of associations to utilize their "specialized expertise and research resources" relating to the subject matter of the lawsuit. *Id.* at 2533. Too restrictive a reading of the requirement would undercut the interest of members who join an organization in order to effectuate "an effective vehicle for vindicating interests that they share with others." *Id.* The third "special feature" of associations cited in *UAW*, their self-policing character, would seem to carry particular force on the germaneness issue. If the "forces that cause individuals to band together" guarantee some degree of fair representation, they surely guarantee as well that associational policymakers will not run roughshod over the strongly held views of

association members in fashioning litigation goals.[16] Thus, in its rationale, *UAW* suggests that it is highly unlikely the second prong of germaneness was meant to set the narrow perimeter of centrality of purpose urged here. Rather, it would seem to require only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together.[17]

This modest functional interpretation of the germaneness requirement is in obvious accord with commonsense and legal understandings of the concept. Black's Law Dictionary, for example, defines "germane" as "in close relationship, appropriate, relative, pertinent." *Id.* at 618.[18] Case law from numerous jurisdictions on various points of law that rely on the concept of germaneness also consistently regards the term as mandating pertinence or connection, but not a substantial overlap, between the two

16. To the extent such self-policing breaks down, the independent first prong of the *Hunt* test, requiring that members suffer a constitutionally cognizable injury in their own right, would of course provide a significant check on renegade leaders of litigious associations.

17. The facts of *UAW* do not, unfortunately, allow us to test authoritatively the validity of this vision of the germaneness prong, for as in *Hunt*, the *UAW* Court saw scant reason to doubt the germaneness of the litigation in question to the organization's purpose. At issue in *UAW* was whether a labor union had standing to challenge a Department of Labor policy which excluded from the tally of weeks of employment used for determining eligibility for trade readjustment allowance benefits those weeks in which employees drew nonregular wages. The Court held the union satisfied all three *Hunt* requirements, writing with respect to germaneness that

there is little question that the interests that the UAW seeks to protect in this suit are "germane to the organization's purpose." The UAW's Constitution announces that one of the Union's goals is to work for legislation on a national scale, having as its object the establishment of real social and unemployment insurance, the expense of which is to be borne by the employer and the Government." In pursuit of that goal, the leadership of the UAW, along with other representatives of organized labor, lobbied hard for the establishment of the establishment of the TRA [trade readjustment allowance] benefit program.
106 S.Ct. at 2531 (citations omitted).

One can, however, interpret the very brevity of the Court's treatment of the germaneness inquiry in *UAW* as limited evidence that it does not perceive the barrier posed by prong two as a particularly high hurdle. Had the Court regarded the germaneness requirement as demanding that the litigation in question be central to the union's aims, and not merely related to them, it might have done more than "pause only briefly" on the issue. *Id.* at 2531. It might have asked, for example, how many members of the UAW fell within the class of parties affected by the trade adjustment policy in question, an omission noted by Justice Powell in his dissent arguing that considerations of adequacy of representation should play a larger role in associational standing doctrine. *Id.* at 2536. Yet even Justice Powell, dissenting on the standing issue, conceded that under existing doctrine, "[i]t is undisputed that achieving unemployment benefits under the program of trade readjustment allowance is 'germane' to the UAW's purpose in the sense that one of its goals is to secure such benefits for its workers. *Id. See also id.* at 2536–37 (Powell, J., dissenting) (urging that Court ascertain not simply "formalistic" germaneness, but also inquire, for example, "that the number of members in the organization with a concrete stake in the outcome ... [not] be so small that this theoretical identity [between the organization and its members] disappears.").

18. Legal thesauruses concur. *Compare* Burton's Legal Thesaurus at 240 (synonyms for "germane") *with id.* at 68 (synonyms for "central").

objects or ideas being compared.[19] None of these cases to the best of our knowledge has construed "germane" to mean "central" or to require more than pertinence between the object and the referent.

Although without more explication than that offered so far we cannot say precisely what the Supreme Court intended to accomplish by the germaneness requirement, this temperate understanding also seems coextensive with the goal the Court most likely had in mind in adding prong two. That goal, as we explain, seems to have been the modest yet important one of preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care.

On initial analysis, one might hypothesize that the germaneness limitation exists to prevent organizations from eluding the standing requirement by manufacturing controversies where none exists. Yet such an interpretation would explain too much, for the independent injury-in-fact requirement (the first *Hunt* prong) already guarantees that only organizations that can identify legitimately aggrieved members can gain representational standing. Alternatively, because prong two obviously does impose limits on organizations beyond mere injury-in-fact, one might regard it as grounded in some skepticism about the capacity of organizations to engage in representative litigation. This view, however, collides in many instances with *UAW*'s observation that organizations are, in fact, unusually well-equipped to litigate certain issues.

Yet in one narrow class of cases, neither the constitutional imperative of injury-in-fact nor the ordinary reality of organizational expertise can be counted on to " 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination,' " *see Hunt*, 432 U.S. at 345, 97 S.Ct. at 2442 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). Those cases involve representational suits filed by organizations on issues on which they as a practical matter lack expertise or resources. In such cases the injury-in-fact prong may in fact prove a porous screen: an organization with a diverse membership could readily produce a sufficient number of members claiming constitutionally cognizable injuries from governmental actions, even if such actions had nothing whatsoever to do with the association's area of competence or reason for existence. An associational standing test allowing such suits could in theory permit organizational leaders to generate legal actions on issues of little concern even to injured members.

An inversion of *Meek* and *UAW*, two cases where the Supreme Court found standing to exist, provides a useful if perhaps extreme example of this undesirable scenario. Were the leaders of a labor union to press an establishment clause challenge to a school-aid program, or a civil libertarian organization to challenge a trade policy on commerce clause grounds, and were each association able to identify a critical mass of members claiming cognizable injuries from these policies, the injury-in-fact prong would apparently be inadequate to prevent a finding of standing—despite the wholesale mismatch between litigation topics and organizational expertise.[20] In such a situation, a litigating as-

---

**19.** *See, e.g., Leisure Technology–Northeast, Inc. v. Klingbeil Holding Co.,* 137 N.J.Super. 353, 349 A.2d 96, 98 (1975) (involving jurisdiction over counterclaims); *Lost Creek Drainage District of Kearney County v. Kring,* 193 Neb. 450, 227 N.W.2d 421, 423 (1975) (involving relation of statute to amendment); *Commonwealth v. Peterman,* 430 Pa. 627, 244 A.2d 723, 730 (1968) (involving introduction into evidence of prior conviction as germane).

**20.** One might object that the same self-policing mechanisms noted by Justice Marshall in *UAW* that can help assure adequate representation should prevent such disjunctive suits from taking place. Common sense, however, suggests that membership vigilance in opposing associational policy varies in direct proportion to the level of membership fervor against that policy. Self-policing thus would seem likely to block nongermane suits with which members strongly disagree; one would expect far less self-policing on low-valence issues which, while unrelated to

sociation would be no more than a law firm seeking to sue *in its own name* on behalf of a client (or a firm member) alleging injury from governmental action wholly unrelated to the firm. These were precisely the facts of *McKinney v. United States Department of the Treasury*, 799 F.2d 1544 (Fed.Cir.1986), one of only two cases of which we are aware in which a federal court denied standing on germaneness grounds. In *McKinney*, the Federal Circuit held that the Washington Legal Foundation, a self-described "non-profit public interest law firm," could not sue to require the Customs Service to bar the importation of Soviet-made goods in an effort to protect the economic interests of producers and workers because these goals were not pertinent to the Foundation's purpose. *Id.* at 1553.[21]

■ The germaneness prong serves as a backstop against such suits. It ensures a modicum of concrete adverseness by reconciling membership concerns and litigation topics by preventing associations from being merely law firms with standing. In so doing, the germaneness requirement serves the standing requirement's critical separation-of-powers goal of restricting the federal judiciary to "the proper—and properly limited—role of courts in a democratic society." *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *see also Allen v. Wright*, 468 U.S. at 751–52, 104 S.Ct. at 3325 ("the law of Art. III standing is built on a single basic idea—the idea of separation of powers"). It of course also serves the desirable goal of preventing association leaders from abusing their offices. Although ensuring responsiveness of organization leaders to members is no Article III goal, in this case representational accountability goes hand-in-hand with the constitutional imperative

> that federal courts may exercise power only "in the last resort, and as a necessity," *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, [12 S.Ct. 400, 402, 36 L.Ed. 176] (1892), and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process," *Flast v. Cohen*, 392 U.S. 83, 97, [88 S.Ct. 1942, 1951, 20 L.Ed.2d 947] (1968).

*Allen*, 468 U.S. at 752, 104 S.Ct. at 3325.[22]

■ It remains only to note that in thus characterizing the germaneness requirement as mandating mere pertinence between litigation subject and organizational purpose, we join a number of other courts which, without any detailed analysis of prong two, have declared it undemanding. *See, e.g., National Constructors Association v. National Electrical Contractors*

---

an organization's purpose, inspire little disgruntlement.

21. The other case denying standing on these grounds is *Local 186, International Brotherhood of Teamsters v. Brock*, 812 F.2d 1235 (9th Cir. 1987), holding that it was not germane to the purposes of a labor union to challenge a racketeering act disqualifying persons convicted of certain crimes from seeking employment in a labor organization. *See id.* at 1239. The court did state that the felon in question, a convicted arsonist named Martin Fry, could sue in his own behalf. *Id.* This result squares with our understanding that prong two guarantees that the grievances expressed in a suit apply to a critical mass of association members: in *Local 186, Teamsters*, the court found that although the arsonist had suffered a cognizable injury, no other union members had. *Id.* at 1238 (allegations that members were deprived of Fry's services and that other members could someday be similarly disqualified were "abstract hypotheticals").

22. An observation made by the Court in the closing paragraph of its discussion of associational standing in *UAW* reinforces this interpretation. Faced with a challenge to the adequacy of representation assured by associational suits, the Court observed that in cases where an association provided its members with "deficient" representation, an adverse determination might not "preclude subsequent claims by association's members." *See* 106 S.Ct. at 2533. In a world where associational claims necessarily precluded subsequent member claims, concerns about unresponsive leadership or faulty representation would ordinarily make one wary of giving girth to the associational power to litigate, for a member's decision to join an organization could in theory bind him on issues not central to the organization's function. The fact that associational suits may not have this always-preclusive power undercuts this potential argument for a stricter reading of the germaneness prong.

*Association*, 498 F.Supp. 510, 521 (D.Md. 1980) (defining germaneness standard as allowing suits by groups whose purposes are "pertinent or relevant to" claim at issue); *American Insurance Association v. Selby*, 624 F.Supp. 267, 271 (D.D.C.1985) (stating that "an association's litigation interests must be truly unrelated to its organizational interests before a court will declare that those interests are not germane"); *Medical Association of Alabama v. Schweiker*, 554 F.Supp. 955, 965 (M.D. Ala.1983) (stating that germaneness test requires that "the injury to [an association's] members has some reasonable connection with the reason the members joined the organization and with the objectives of the organization").[23] We now proceed to inquire whether the Humane Society has satisfied this modest but sensible standard.

#### b. *Is the Germaneness Requirement Satisfied Here?*

■ In light of the foregoing analysis, we have little difficulty concluding that challenging hunting on wildlife refuges is germane to the Humane Society's purposes. The plethora of affidavits submitted by the Society on behalf of its members demonstrate that the injuries alleged by the Society are neither manufactured ones nor unreflective of the membership of the organization. Nor can it be seriously claimed that the Humane Society's goal of protecting animals and assuring their humane treatment is so far removed from the goals of this lawsuit to strip it of the

special expertise that the Supreme Court has cited as a primary advantage of associational lawsuits.[24]

In concluding that the Humane Society's complaint foundered on the germaneness prong of the *Hunt* test, the district court was apparently misled by its characterization of the Society's members' injuries as "recreational." Adopting the more apt characterization—that the alleged injury is to members' aesthetic interest in viewing live animals and birds—makes the pertinence of the Society's claim to its humanitarian goals apparent. Both the Society and this lawsuit, quite simply, have as their goal keeping animals and birds alive and well.

■ It is surely true that the Humane Society makes no specific reference in its certificate of incorporation to advancing its members' interest in viewing animals. *Brock*'s germaneness prong inquiry ended with its finding that the UAW's statement of purpose included those goals sought to be vindicated by the litigation in question. Yet the Court nowhere has suggested that mention of a given purpose in an organization's organic papers is talismanic or, indeed, anything more than strong evidence of purpose. In any event, we regard it as reasonable to consider, as an unstated but obvious side goal of preserving animal life, permitting enhanced human appreciation of other living things. Numerous member affidavits submitted by the Humane Society testify to this dual goal.[25] *See also Ani-*

23. While our circuit has not delved in detail into the meaning of the germaneness prong, the one case in which a D.C. Circuit panel did characterize the potency of this requirement is in accord with this view. The case has been vacated for rehearing *en banc. See Hotel & Restaurant Employees Union, Local 25 v. Attorney General*, 804 F.2d 1256, 1265 (D.C.Cir.1986), *vacated for reh'g en banc*, 808 F.2d 847 (D.C.Cir.1987) (germaneness prong is "satisfied when the association's purposes are reasonably related to the challenge it seeks to bring").

24. Although in numerous previous cases the Humane Society has litigated to the merits challenges to various environmental policies, *see, e.g., Humane Society of the United States v. EPA*, 790 F.2d 106 (D.C.Cir.1986), and although in theory similar standing objections based on the Society's animal-focused purposes could have

been raised, those cases cannot serve as binding authority here for the Society's standing because it appears that standing was never raised. *See Allen v. Wright*, 468 U.S. 737, 764, 104 S.Ct. 3315, 3331, 82 L.Ed.2d 556 (1984); *Pennhurst State School & Hospital v. Haldeman*, 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984); *Hagans v. Lavine*, 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974) ("when questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us").

25. Although some Society members, preferring that refuges be closed to the public altogether, may not share this aesthetic goal, our decision in *National Maritime Union of America v. Com-*

,mal Welfare Institute v. Kreps, 561 F.2d 1002, 1007 (D.C.Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) ("Where an act is expressly motivated by considerations of humaneness toward animals, who are uniquely incapable of defending their own interests, it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute.").

Moreover, despite the absence of an explicit reference to aesthetic interests in the Society's certification of incorporation, that document contains a separate provision underscoring the harmony between the goals of this lawsuit and the animal-protective goals of the Society. Immediately after enumerating its purposes, see note 9, supra, the certificate authorizes the group's directors and officers "to do all such acts as are necessary or convenient to the attainment of the objects and purposes herein set forth, and to the same extent and as fully as any natural person might or could do." J.A. 227. Not unlike the necessary and proper clause in the U.S. Constitution, the clause would appear to legitimate otherwise unenumerated activities when necessary to further previously identified goals. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Because the objects of the Humane Society's solicitude of course have no standing on their own, we believe a reasonable reading of the Society's "necessary or convenient" clause, in light of the Society's goal of preserving animal life, authorizes as consistent with, and surely germane to, the Society's purposes litigation on behalf of such animals.[26]

mander, Military Sealift Command, 824 F.2d 1228 (D.C.Cir.1987) forecloses this internal conflict as a basis for defeating associational standing. See id. at 1234 ("we think that the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of some members").

26. The affidavits submitted in this case suggest that the Society's stated purpose of fostering the value of humane behavior through writings and teachings could serve as an alternative ground on which to premise associational standing. A

For these reasons, we conclude that this lawsuit challenging the revivification of hunting on wildlife refuges is germane to the purposes of the Humane Society, and therefore conclude that the organization has standing to challenge these practices as a representative of its members.[27]

B. Prudential Dimensions

We pause only briefly on the district court's final ground for restricting the Humane Society's standing: that the claims advanced by the Society fell outside the zone of interests of the Endangered Species Act and the two Refuge Acts. In this inquiry, we gain much guidance from the Supreme Court's most recent explication of this prudential limitation:

The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision.... The test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would be plaintiff.

Clarke v. Securities Industry Association, — U.S. —, 107 S.Ct. 750, 757, 93 L.Ed. 2d 757 (1987) (footnotes omitted). Clarke establishes that there need only be a "plausible relationship" between the interests of the litigants and the policies embodied in

number of Humane Society affiants express fear that allowing hunting on refuges may interfere with their writings and teachings. See, e.g., Church Aff.; Cole–Blaha Aff.; Harmon Aff.; Ryden Aff.; Wigand Aff.; Wood Aff.

27. Because we conclude that the Humane Society has standing, we need not reach the issue of whether co-plaintiff Kindler has standing to challenge violations on refuges he has not visited. See Watt v. Energy Action Educational Foundation, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

"the overall context" of the statutes at issue. *Id.* 107 S.Ct. at 758–59.

■ Protecting the human aesthetic interest in viewing live animals and birds plainly bears a plausible relationship to the policies embodied in the two Refuge Acts. The two Refuge Acts have as their principal aim the protection of wildlife. *See* S.Rep. No. 1858, 87th Cong., 2d Sess. 1 (1962); H.R.Rep. No. 1473, 87th Cong., 2d Sess. 3 (1962) (on Refuge Recreation Act); H.R.Rep. No. 1168, 89th Cong., 1st Sess. 2 (1965) (on Refuge Administration Act). The House Report on the Refuge Recreation Act demonstrates the linkage between wildlife preservation and wildlife appreciation: it enumerates among the contemplated uses of refuges the "observation of wildlife in its native habitat, photography, sightseeing, picnicking, camping, swimming and fishing, and boating." H.R.Rep. No. 1473, *supra,* at 2–3 (stating as well that "[t]he purpose of the bill ... is to permit the enjoyment of national fish and wildlife conservation areas by a larger segment of our population"). *See also Animal Welfare Institute,* 561 F.2d at 1007. Here again the district court's decision directly resulted from its classification of the interest of Society members as "recreational," rather than the more apt description, used by the Supreme Court in *Sierra Club,* as "aesthetic." The fact that the Refuge Recreation Act does delimit permissible recreational activities on refuges therefore should not disentitle these plaintiffs, whose concern as animal and bird watchers is hardly at odds with the substantive prescriptions of the Acts, to sue under them.

■ For similar reasons, the interests of Humane Society members also fall within the zone of interests protected by the Endangered Species Act. That statute aims to "provide for conservation, protection and propagation of endangered species of fish and wildlife ...," S.Rep. No. 307, 93d Cong., 1st Sess. 1 (1973), primarily by requiring the Wildlife Service to analyze proposed federal actions so as to evaluate these actions' potential impact on threatened or endangered species. *See* 16 U.S.C. § 1533(b). There is no dispute that endangered species exist within the refuges. As we held in *National Audubon Society v. Hester,* 801 F.2d 405, 407 n. 2 (D.C.Cir. 1986), the activities of observing and studying such wild animals and birds "are within the zone of interests protected by the ESA." The Supreme Court reached a similar conclusion in *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986), holding that whale-watching and whale-studying fell within the zone of interests of two statutory amendments designed to guard against the depletion of certain species of fish.[28]

### III. NEPA COMPLIANCE AT THE CHINCOTEAGUE REFUGE

We reach, finally, the sole merits issued decided by the district court: its determination that the Wildlife Service had complied with NEPA in deeming adequate its environmental assessment of the decision to allow some bird hunting in a portion of the Chincoteague refuge.

NEPA requires officials engaged in "major Federal actions" to complete an environmental assessment (EA) that evaluates the action's potential environmental impacts and adjudges whether the statute's

---

**28.** We find no merit in the Wildlife Service's argument that the Society's Refuge Act claims have been mooted by the Service's subsequent suggestion in a refuge manual that refuge managers undertake annual compatibility reviews. The revised manual neither mandates such reviews nor provides standards governing them, and thus we have no reason to believe that the Service has corrected the procedural deficiencies alleged by the Humane Society.

The Wildlife Service's additional defense that the plaintiffs failed to provide the required 60 days notice to the Secretary for its ESA claims is equally unavailing. The Society's complaint in this action was filed November 24, 1984. On August 30, 1984, the comments submitted to the Secretary on the opening of 13 refuges to hunting, the Society stated: "These comments constitute notice of our intent to file suit under the above acts if the proposed hunting programs and special regulations are not withdrawn. *See* Plaintiffs' Opposition to Defendants' Cross–Motion for Summary Judgment filed April 1, 1986, at Exhibit L, p. 3. *See also id.,* at Exhibit K, p. 9.

mandate for preparation of an environmental impact statement (EIS) has been triggered. *See* 42 U.S.C. § 4332(C). If the EA concludes that the federal action in question will have "no significant impact," and thus that no EIS is required, the agency must explain this finding.

Plaintiffs assert that in finding no significant impact at Chincoteague, the Wildlife Service failed to discuss certain types of data relevant to hunt opening decisions. Specifically, the Society urges that the Service included in its EA virtually no data bearing on (1) surveys and counts of animals observed in the wild; (2) age cohorts and sex ratios for populations of each species; (3) the number and distribution of animals of each species taken by hunters and trappers; (4) the number of hunters and trappers seeking each species and the effort they make to do so; and (5) information respecting the location, quality and condition of each species' habitat. It also suggests that the Service failed to "give serious consideration to the potential cumulative impacts of sport hunting."

Cases in this circuit employ a four-part test to evaluate agency findings of "no significant impact." We evaluate:

(1) whether the agency took a "hard look" at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

(4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983). Our mission is simply to ensure that the agency took account of these factors and that its decision was not arbitrary and capricious.

 Reviewing the Wildlife Service's EA in light of these factors, we conclude that the district court correctly upheld the EA's "no significant impact" finding as not arbitrary and capricious. As the district court noted, the 19–page assessment evaluates four alternative hunting plans, possible endangerment to selected species, benefits to the community, benefits to the refuge through culling of excessive bird populations, disturbances to the wildlife, and the potential impact of the hunting program given the refuge's size. *See* District Court Opinion II at 10.

The Wildlife Service's consideration of these factors satisfies our "hard look" inquiry, and its focus on endangered species and the repercussions of hunting, though lacking in the precision urged by the Humane Society, "identifie[s] the relevant areas of environmental concern" and constitutes a sufficiently convincing case that the impact is insignificant. The agency also notes the fact that hunting had long been allowed on the portion of Chincoteague in question, a 492–acre section known as Wildcat Marsh which was acquired by the Wildlife Service in 1983. The hunting plan selected was not as broad in scope as others considered by the Service, keeping, in conformity with the fourth factor of our review, any adverse impacts to a minimum.

Although one might wish the Wildlife Service had addressed with greater specificity the five factors urged above by plaintiffs, in the context of the overall assessment filed by the Service the cursory treatment these factors receive is not fatal to the Service's finding. As the district court noted, the small size of the marsh, coupled with the mobility of the birds and animals under analysis, make site-specific statistical analysis like that required by the Society's proposed five factors, difficult to carry out. As in *National Audubon Society v. Hester*, 801 F.2d 405 (D.C.Cir.1986), a case also involving the adequacy of an EA, "[t]he Service's documentation may have been succinct, but nonetheless adequately discloses the concerns underlying the agency's decision and demonstrates that the decision rests on a rational basis." *Id.* at 408.

CONCLUSION

For the reasons stated in the foregoing, we reverse the district court's finding that the Humane Society had no standing and

order remand so that the court may address the merits of the Society's claims; and we affirm the district court's finding that the hunt opening at Chincoteague complied with NEPA.

*So ordered.*