The HUMANE SOCIETY OF
the UNITED STATES, et
al., Plaintiffs,

v.

Manuel LUJAN, Jr., et al., Defendants.

Civ. A. No. 89–2772.

United States District Court,
District of Columbia.

June 18, 1991.

Mark D. Colley, James W. Conrad, Jr., Davis, Graham & Stubbs, Washington, D.C., for plaintiffs.

Richard B. Stewart, Asst. Atty. Gen., James C. Kilbourne, Charles R. Shockey, Wildlife & Marine Resources Section, Environmental & Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This case is brought by a public interest organization, the Humane Society of the United States, and various coalitions of homeowner/citizens, against the United States Secretary of the Interior and the Director of the Fish and Wildlife Service ("FWS" or "the Service") to prevent the implementation of defendants' decision to permit limited public deer hunting on a national wildlife refuge in Fairfax County, Virginia. The case is now before the Court on the parties' dispositive cross-motions for final judgment on the record, having been preceded by some evidentiary proceedings

in open court on plaintiffs' several attempts to obtain preliminary injunctive relief.[1] For the reasons to follow, the Court will deny plaintiffs' motion and grant the defendants' motion, dismissing the complaint with prejudice.

In August, 1989, the FWS issued a final rule, 54 Fed.Reg. 36032 (Aug. 31, 1989), opening the Mason Neck National Wildlife Refuge ("the Refuge") for deer hunting during the fall hunting season in Virginia. The Refuge, comprising approximately 2300 acres of Mason Neck, an 8000–acre peninsula on the south shore of the Potomac River 18 miles downstream from Washington, D.C., was established in 1969 as a habitat and sanctuary for bald eagles. It has been altogether closed to hunting for the first 20 years of its existence. The decision in 1989 to open it to deer hunting was impelled, in principal part, by FWS' desire to find an expedient to control the Refuge's burgeoning white-tailed deer population.

The Humane Society questions the legitimacy of the Service's justification for the hunt, as well as its refusal to acknowledge the potential for harm to the wildlife species to which the Refuge is dedicated, the bald eagle. The homeowner organizations are primarily fearful of injury to people and property in the vicinity, although some individuals apparently share the Humane Society's abhorrence of animal hunting generally.

Plaintiffs bring this action under an array of federal statutes respecting the Nation's wilderness assets. Each statute cited imposes some obligation or duty upon, *inter alia,* the Secretary and the Service, of which defendants' decision to open the Refuge to deer hunting, according to plaintiffs, arguably places them in breach. If, for example, bald eagles should be adversely affected by the hunt, accidentally or otherwise, the defendants will have been accomplices to a violation of the Bald and Golden Eagle Protection Act of 1940, 16 U.S.C. §§ 668–668d. So also with respect to the Migratory Bird Treaty Act of 1918, 16 U.S.C. §§ 703–711. The Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1544, requires all federal agencies to "conserve" endangered species. The hunt, plaintiffs say, will actually place bald eagles in jeopardy, not "conserve" them. Moreover, plaintiffs allege defendants' finding that the hunt will have no "significant" environmental impact is simply wrong. It most assuredly will have such an impact—on deer, on eagles, and possibly on people and property—and, thus, the decision contravenes the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4335, by the absence of an environmental impact statement in the administrative record compiled in conjunction with the rule-making process resulting in the decision to implement the hunt.

## I.

■ The Secretary and FWS have moved to dismiss Count IV of the complaint on procedural grounds. Count IV purports to assert a direct cause of action under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1544 ("ESA"), the statute imposing the general obligation upon federal departments and agencies to "conserve" endangered species of wildlife, 16 U.S.C. § 1531(c)(1). The bald eagle is an endangered species, and ESA makes it unlawful for anyone to "take" a specimen of such species, 16 U.S.C. § 1538(a)(1)(B).[2] It also provides expressly for its enforcement by "citizen" civil suits commenced by "any person" against any other person, including the United States and its officials, to enjoin its violation. 16 U.S.C. § 1540(g)(1)(A). The final rule, the plaintiffs allege, does nothing to "conserve" the endangered bald eagles; to the contrary, it poses a significant danger that bald eagles will be "taken," even if inadvertently.

"Citizen suits" to enforce the ESA, however, are required by the Act itself to be preceded by at least 60 days' written notice

---

1. *See* Memorandum and Order of November 6, 1990, the findings and conclusions of which are adopted and incorporated herein.

2. To "take" a species is, *inter alia,* to "harass" or "harm" it in any way, not merely to shoot, kill, or capture it. 16 U.S.C. § 1532(19).

of the violation to the Secretary and to the "alleged violator" (in this case, presumably the FWS). 16 U.S.C. § 1540(g)(2)(A). Defendants assert that plaintiffs failed to give the required 60–day pre-suit notice before commencing this action; indeed, they have yet to give it. Plaintiffs respond that their announced intention to sue, made in the comments they submitted to FWS during the notice-and-comment period of the rule-making in opposing the idea of a hunt, sufficed as notice to the Secretary and FWS that litigation would be forthcoming if the final rule were adopted.

In *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), however, the Supreme Court interpreted a similar statutory pre-suit notice requirement, observing that the statutory provision "could not be clearer." The Supreme Court continued to hold that, by the literal language of the statute, "compliance with the 60–day notice provision is a mandatory, not optional, condition precedent for suit." 110 S.Ct. at 309. For this Court's purposes, the holding of *Hallstrom* is equally clear, and plaintiffs make no effort to distinguish *Hallstrom*.[3]

ESA clearly states that "written notice" of the violation must be given to the Secretary *and* to the violator as a condition precedent to suit. It was not given here. A party's "comment," submitted to an agency in the course of a rule-making, does not constitute the formal pre-suit notice required by ESA, no matter how vehement-

ly it may have conveyed the party's intention to go to court if the rule ultimately adopted were not to its liking. Count IV of the complaint will be dismissed.[4]

## II.

Other counts in the complaint, however, are based on the Refuge Recreation Act of 1982, 16 U.S.C. § 460k et seq.; the National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. §§ 668dd, 668ee; the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; and a FWS regulation. "Agency action" alleged to be in contravention of these statutes is presumably amenable to judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). The parties have cross-moved for summary judgment on these remaining counts.

In reviewing the FWS' decision to open the Mason Neck Refuge to deer hunting, the Court is, of course, obliged to apply the APA standard of review, *viz.*, whether the agency acted "arbitrarily or capriciously, committed an abuse of discretion, or acted otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[5] As always under the APA, the reviewing court is expected to limit itself to the contents of the administrative record.[6] *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The reviewing court is also not to substitute its judgment for that of the agency. It is simply to ascertain whether

---

3. The *Hallstrom* case proceeded under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972 ("RCRA"), but the Supreme Court itself noted that the ESA notice provision would have compelled a similar result. 110 S.Ct. at 307, n. 1.

4. Defendants also move to dismiss those counts charging violations of the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668–668d ("BGEPA") (Count III); and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–711 ("MBTA") (Count V), neither of which provide expressly for private causes of action. Plaintiffs respond that they are really proceeding in Counts III and V *via* the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as a party aggrieved by agency action that is "not in accordance with law," i.e., the BGEPA and MBTA. The Court assumes without deciding that plaintiffs may do so. *But*

see *Defenders of Wildlife v. Administrator, Environmental Protection Agency*, 882 F.2d 1294 (8th Cir.1989).

5. *See, e.g., Humane Society of United States v. Hodel*, 840 F.2d 45 (D.C.Cir.1988).

6. Although in theory, judicial review under the APA is confined to the administrative record, as a practical matter in this case the administrative record has been abundantly supplemented by additional filings by both sides; live testimony taken in conjunction with plaintiffs' requests for preliminary relief; the Court's own inspection on-site of the portions of the Refuge on which hunting has taken and will take place; and the prescience afforded for the future by the actual experience with the 1989 archery hunts and the 1990 shotgun hunt which the Court permitted to go forward while the case was pending.

the agency has examined the relevant data and articulated a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made. Only a "clear error of judgment" may be set aside. *Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quotation marks and citations omitted).

The National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. §§ 668dd, 668ee, and the Refuge Recreation Act of 1962, 16 U.S.C. § 460k, authorize the Secretary of the Interior to permit "appropriate incidental or secondary use(s)" of wildlife refuges, even though "recreational" in character, including hunting, which are "compatible with, and will not prevent accomplishment of, the primary purpose for which the[se] areas were established." 16 U.S.C. §§ 460k, 668dd(d). The applicable regulation provides that any action the Secretary takes must be "consistent with principles of sound wildlife management, and must otherwise be in the public interest." 50 C.F.R. 32.1.

The parties are in voluble disagreement as to how to ascertain whether a secondary use of a wildlife refuge is "compatible" with its primary purpose.[7] Plaintiffs postulate the existence of an "almost absolute presumption" against secondary uses of wildlife refuges, a phrase derived from the case of *Defenders of Wildlife v. Administrator, Environmental Protection Agency*, 688 F.Supp. 1334, 1355 (D.Minn.1988), *aff'd in relevant part*, 882 F.2d 1294, 1299–1301 (8th Cir.1989). They also cite an earlier decision of another judge of this district court in *Defenders of Wildlife v. Andrus*, No. 78–1210 (D.D.C. July 14 & Aug. 18, 1978) (*"Ruby Lake"*), permanently enjoining the FWS from permitting recreational motorboating at the Ruby Lake National Wildlife Refuge in Nevada. The *Ruby Lake* court declared that the

"burden of proof is necessarily on [the Service] to demonstrate that [recreational] use is incidental to, compatible with, and does not interfere with the primary purpose of the refuge," and that the RRA "does not permit [FWS] to weigh or balance ... recreational interests against [that] purpose." *Defenders of Wildlife v. Andrus*, No. 78–1210, slip op. at 9 (D.D.C. July 14, 1978).[8]

Defendants reject plaintiffs' suggestion that anything resembling a formal "presumption" against secondary uses is to be found in the legislation. They submit that the Act requires only that the Secretary make a "finding" that the proposed secondary use is "compatible" with the primary purpose of the Refuge, as he has in this case, and this Court must review that finding under the familiar inhibitions of APA review. *See Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C.Cir. 1988); *Friends of Animals, Inc. v. Hodel*, Civil Action No. 88–2978, 1988 WL 236545 (D.D.C. Nov. 10, 1988).

■ The Service has contended throughout these proceedings that the hunt is actually part of an overall "refuge management plan," and that the hunt will, in fact, further the primary purpose of the Refuge in providing an authentic natural habitat for bald eagles. FWS asserts that deer overpopulation in the Refuge is causing its degradation; excessive browsing has shorn away much ground level new growth. Plaintiffs argue that the relevant data on the deer population at Mason Neck is too sparse, dated, and sporadic to provide a reliable indication of the size of the deer herd. Further, because deer are nomadic and can be found throughout the Mason Neck peninsula, including other parklands adjacent to the Refuge, it is far from certain that reducing the herd indigenous to or found in the Refuge itself will solve the problem of overbrowsing. The hunt may

---

7. The RRA states that secondary uses of wildlife refuges may be regarded as "compatible" with their primary purposes if they would (1) "not prevent accomplishment of," (2) are "not inconsistent with," or (3) "will not interfere with" the primary purpose. 16 U.S.C. § 460k. The term

is not otherwise, however, further statutorily defined.

8. The Ruby Lake Refuge's "primary purpose" was to serve as a breeding ground and sanctuary for migratory birds, principally waterfowl.

not, therefore, significantly reduce the foraging deer population in the Refuge.[9]

Nevertheless, the administrative record reflects that the FWS has monitored the deer presence in the Refuge since the 1970's by several methods, all of which, flawed or not, showed it to be steadily increasing. By 1988 the size of the herd was estimated to be roughly double the number the land area could comfortably support. Inspection of the vegetation reinforced the population estimates; browsing to excess was, at least in the Service's opinion, apparent, to knowledgeable observers. Examination of deer carcasses disclosed evidence of malnutrition, a sign, the Service said, that the deer, as well as the flora upon which they fed, were suffering as a result of their overabundance.

Having concluded that the deer population must be reduced, the record shows, the FWS did give thought to alternative means of doing so. Trapping and transportation were rejected as too time-consuming, labor-intensive, and costly, as was chemical sterilization of the deer. The introduction of predators was contraindicated by the proximity of human habitation. FWS was without sufficient personnel at the Refuge to do the job in-house by itself. A well-controlled public hunt was in its judgment, the

optimum solution. That it would simultaneously gratify the desire of some local sportsmen for the opportunity to hunt Mason Neck was merely a felicitous by-product.

FWS then turned to the matters of the eagles' and public safety during the hunt. The hunt territory was to be limited to the inland areas, away from the eagles' preferred roosting sites near the river shore. The single extant eagles' nest would be circumscribed by a buffer zone in which neither hunting nor transit would be permitted.[10] And boundaries would be fixed, and well-marked, to keep hunters away from dwellings and roads adjacent to the Refuge.[11] *See, generally,* AR 25–42.

This Court need only conclude that the agency took account of the relevant factors, and that the decision was not arbitrary and capricious, in order to sustain it. FWS appears to have done as it was obliged to do here, as this district court has concluded in other cases challenging similar decisions by the Service to open other wildlife refuges to deer hunting. *See Friends of Animals, Inc. v. Hodel,* Civil Action No. 88–2978, 1988 WL 236545 (D.D.C. November 10, 1988) (Supawna Meadows, New Jersey); *Humane Society of United States v. Clark,* Civil Action No.

---

9. Plaintiffs actually find nothing about the decision to allow the hunt to be defensible. Not only is the ostensible justification offered for it specious, they contend, but the precautions taken by FWS against injuries to persons or property are inadequate or futile; the disturbance of the bald eagles' tranquility, not to mention their health, a virtual certainty; and the hunt as a means to an end, i.e., a reduction of the deer herd, as cruel as it is inefficient.

10. Several studies contained in the record suggest that any human presence, and, in particular, gunfire, disturb eagles, causing them to "flush", or fly out of their roosts and flee from the disturbance. At the preliminary injunction hearing in November, 1990, the Court received extrinsic evidence regarding eagles' sensitivity to the presence of humans, and it concurred with the Secretary's finding that the shotgun hunt would not unduly disturb the eagles. Experience with the 1990 shotgun hunt has not disproved that conclusion.

11. Plaintiffs contend that the proximity of private dwellings to the Refuge, as well as a major

thoroughfare which is traversed daily by school buses, makes the hunt inordinately dangerous to humans. Plaintiffs assert that the buffer zones which the FWS has established are inadequate to assure safety, because shotgun blasts can, according to plaintiffs, travel distances in excess of the buffer zones, and because certain hunters will "inevitably" either not see or will ignore the markers delineating the buffer zones.

As the Court observed upon its own visit to the premises of the hunt, the hunt area is separated from homes and from the road by buffer zones of a minimum of 275 and 100 yards, respectively. The boundaries are well-marked by swatches of brightly colored material every several yards, each visible from its nearest neighbor. Additionally, all hunters wishing to participate in the hunt must attend a safety orientation session.

It is possible that some hunters may disregard the markers or disrespect the rules, but as the Court has previously observed, the fact that some people will break the rules does not demonstrate the folly of promulgating such rules in the first place. And again, experience with the 1990 shotgun hunt is reassuring.

84–3630, slip op. at 8–12 (D.D.C. January 27, 1987), *aff'd in pertinent part, reversed on other grounds sub nom. Humane Society of United States v. Hodel*, 840 F.2d 45 (D.C.Cir.1988) (Chincoteague, Virginia).

As was true in those cases, this controversy, too, it appears, is animated primarily by the plaintiffs' fundamental philosophical and public policy disagreement with the government over the wisdom, and perhaps the morality, of the sanctioned killing of wild game on public lands ironically denominated a "wildlife refuge." Neither wisdom nor morality, however, is countenanced as a ground upon which this Court may substitute its judgment as to the proper uses to be made of the Refuge for that of the defendants, even were it wholly in sympathy with plaintiffs.

For the foregoing reasons, therefore, it is, this 18th day of June, 1991,

ORDERED, that plaintiffs' motion for summary judgment is denied; and it is

FURTHER ORDERED, that defendants' motion to dismiss and motion for summary judgment is granted, and this case is dismissed with prejudice.