**NATIONAL AUDUBON
SOCIETY, Plaintiff,**

v.

**F. Eugene HESTER, et al., Defendants.**

**Civ. A. No. 86-0053.**

United States District Court,
District of Columbia.

Feb. 3, 1986.

Kenneth Berlin, Edward F. Gerwin, Jr., Winston & Strawn, James P. Leape, National Audubon Soc., Washington, D.C., for plaintiff.

Peter R. Steenland, Karen L. Florini, Donald A. Carr, Leslie M. Kannan, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION GRANTING PRELIMINARY INJUNCTION

BARRINGTON D. PARKER, Senior District Judge:

In this proceeding plaintiff National Audubon Society ("Audubon" or "NAS") seeks to enjoin the United States Fish and Wildlife Service ("FWS") from capturing and removing from the wild all the remaining California Condors. The decision to remove the Condors from the wild was finalized by the FWS in December 1985. While the parties have filed cross-motions for summary judgment as well as supporting legal memoranda and other pleadings in connection with plaintiff's motion for preliminary injunction, this Opinion resolves only the latter motion.

For the reasons set out below, the plaintiff's application for injunctive relief is **granted.** The Court will also grant the plaintiff's motion for summary judgment.

The opinion supporting that ruling will be filed at a later date.

## BACKGROUND

The National Audubon Society is a long-established non-profit national organization concerned with the conservation and prudent use of the Nation's natural resources, including its endangered species. The California Condor is the largest flying land bird in North America and one of the rarest species of birds on this continent. On March 11, 1967, it was one of the first species to be listed under the Endangered Species Act ("ESA"), 16 U.S.C. § 1533. *See* 50 C.F.R. 17.11(h). At that time it was estimated that only 40 Condors remained in the wild.

There is little dispute as to the underlying facts in this litigation. The parties have stipulated and agreed on the many facts material to the outcome of the case. They rely principally upon the Administrative Record ("A.R.") as the source of their factual assertions.

There are at the present 26 Condors in existence; five continue to live in the wild, and 21 are held by the Los Angeles Zoo and the San Diego Wild Animal Park. Before the winter of 1984–85, there were 15 birds in the wild, but during that winter six of the birds perished from as yet unknown causes.[1] Later in the spring of 1985, three of the remaining nine Condors were captured. The death of the bird designated AC–3[2] on January 18, 1986 left a population of only five wild Condors.

In December 1979, a consortium of governmental and private groups joined in a Captive Recovery Program designed to work toward and ensure the preservation and the continued survival in the wild of the California Condor. Included in that group are FWS, Audubon, the California Department of Fish and Game, the United States Forest Service, and the Bureau of Land Management. FWS and Audubon were named as the agencies having lead

---

**1.** It is widely believed that lead-poisoning was at least a substantial factor in the increased mortality experienced by the birds.

**2.** "AC-" denominates an adult bird; immature birds bear the designation "IC-".

responsibility for establishing and conducting the California Condor research and recovery programs.

The Recovery Program has long emphasized that three measures are essential to ensuring the continued survival of the species in the wild: (1) captive propagation of birds to be reintroduced into the wild; (2) research relying principally on radio telemetry to study the habits and the habitat of the wild Condor population; and (3) continued efforts to preserve and acquire important habitats.

Until December 1985, FWS viewed as critical to the Recovery Program the continued maintenance of a wild population. On December 16, 1985, FWS executed an abrupt about-face and issued a permit authorizing the capture and removal of all surviving wild California Condors.

After learning of FWS' intentions, Audubon then filed this suit, seeking injunctive and declaratory relief against any further trapping of Condors. Plaintiff charges in the complaint filed on January 9, 1986, that the issuance of the amended permit was arbitrary and capricious and thus violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), as well as Sections 7 and 10 of the Endangered Species Act, 16 U.S.C. §§ 1536, 1539,[3] and Section 102 of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. Specifically with regard to its challenges under the latter two statutes, Audubon contends that in making its decision, FWS (1) failed to "insure" that capture of the remaining Condors would not "jeopardize the continued existence of . . . [the] species or result in the destruction or adverse modification of habitat of such species . . . ," in violation of ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2); (2) failed to otherwise protect the habitat of the Condors in violation of ESA § 7(a)(2); (3) failed to consider the "best scientific . . . data," in violation of ESA § 7(a)(2) and 50 C.F.R. § 17.22(b)(5) (regulations promulgated under ESA § 10, 16 U.S.C. § 1539);

(4) failed to comply with the emergency permit requirements of ESA § 10, 16 U.S.C. § 1539(c), and (5) failed to prepare an Environmental Impact Statement ("EIS") as required by NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C) or to adequately discuss the available alternatives pursuant to NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(E).

## ANALYSIS

In order to prevail on its motion for preliminary injunction, plaintiff must show (1) likelihood of success on the merits; (2) that, without obtaining the relief requested, it would be irreparably injured; (3) that the issuance of a stay would not substantially harm other parties; and (4) that the public interest favors the issuance of the injunction. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958).

### A.

### LIKELIHOOD OF SUCCESS ON THE MERITS

**APA and ESA Claims**

 While the APA is not an independent grant of jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977), the judicial review provisions of the APA do apply to actions taken pursuant to the ESA. *Cabinet Mountains Wilderness v. Petersen*, 685 F.2d 678, 685 (D.C.Cir.1982). Accordingly, to prevail on the merits plaintiff must demonstrate that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). An agency must follow its own precedents or explain any deviations from them. In the absence of reasons for the change, the action of the agency is arbitrary and capricious under APA. *Local 777, Democratic*

---

**3.** In its motion for summary judgment, the government raised, and then disclaimed reliance upon, plaintiff's failure to comply with the 60–day notice requirements for the bringing of a citizen suit under ESA § 11, 16 U.S.C.

§ 1540(g). Plaintiff did give written notice, on October 28, 1985, of its intention to sue with respect to an earlier permit amendment. Accordingly, the plaintiff is at least in substantial compliance with the notice requirement.

*Union Org. Comm. v. NLRB*, 603 F.2d 862, 882 (D.C.Cir.1978). Prior policy cannot casually be ignored and a reasoned analysis must accompany changes from previous decisions.

■ In determining whether or not an agency decision was arbitrary or capricious, the reviewing court must be wary of substituting its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Rather, the court should accord the actions of an agency due deference where the agency has resolved a controversial issue reflecting competing expert opinions. *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1160 (D.C.Cir.1980). Nevertheless, when an agency changes its course, it must supply a "reasoned analysis" indicating what factors brought about the change and why. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983).

In this proceeding, the record offers no reasoned analysis nor any strong justification for FWS' abrupt policy reversal. FWS has referred repeatedly, both in its papers and in oral argument, to the exigent circumstances occasioned by the decline of the wild population during the winter of 1984–85. Yet in September 1985, FWS prepared an Environmental Assessment ("EA") that reviewed seven alternative courses of action designed to deal with the potential danger to the wild population during subsequent winters. A.R. 57, attach. FWS specifically rejected the capture of all the remaining wild birds and emphasized that the elimination of a wild population would decrease the likelihood that captive birds could later be successfully released into the wild. Instead, FWS decided that the best course would be to remove only three birds from the wild and to then release three captive birds into the wild. Upon later learning that no release birds were likely to be available, FWS amended the EA on November 26, 1985 to provide

that, while only three birds were still to be captured, three would be released only if available. A.R. 67.

It appears that between November 26, 1985, when the last EA amendment favoring maintenance of a wild population was issued, and December 23, 1985, when FWS authorized capture of all the remaining birds, nothing occurred to justify such a sudden policy reversal. In the December 23 EA amendment recommending capture, A.R. 84, as well as in a December 16 memorandum from FWS Director Hester, A.R. 79, FWS cites three "new" factors that it claims required a change of course. These were (1) that a female, AC–8 (previously designated for capture) and a male, IC–9, were exhibiting "courtship behavior"; (2) that a female, AC–3, was discovered to have an elevated level of lead in her blood; and (3) that five potential release birds were not likely to be available in 1986, due to mishandling at the Los Angeles Zoo. Yet all of these factors were known to FWS before November 26, 1985, at which time the agency still believed that at least some birds should be left in the wild.[4] Moreover, if the factors were truly "new," it is surprising that FWS consulted with no one in the scientific community—or even with its own biologist and geneticist—between November 26 and December 23, 1985, even though they had been consulted and involved in prior discussions. Stipulation No. 16.

Even were the factors cited by FWS "new," the December 23 EA addendum appears to provide insufficient analysis of the type required to justify a policy reversal. While acknowledging the drawbacks to capture of all the remaining birds, drawbacks that had previously led FWS to conclude that a wild population must be maintained, FWS seems to have ignored them and rather to have concentrated only on the need to maximize genetic diversity in the captive population. Such concentration on a single factor to the exclusion of all others is all the more surprising in view of an

---

4. FWS suspected the courtship behavior in early October 1985, Stipulation No. 17. AC–3 indicated a lead level of 1.8 ppm on November 23, 1985. A.R. 86. By October 30, 1985, if not

earlier, FWS was on notice that no release birds would likely be available in 1986. A.R. 62, 64, 65.

October 16, 1985 letter from Director Hester to the California Department of Fish and Game. A.R. 54. In that letter, Hester states that the genes of the remaining wild birds were well represented in the captive population and that, consequently, FWS was willing to risk the loss of one or more of the three birds to be left in the wild. In an earlier presentation to the California Fish and Game Commission, Jan Riffe of FWS stated that nearly 100 percent of the gene pool was represented in the captive population. A.R. 45 at 6. Why suddenly FWS came to believe that the captive gene pool was in danger and that that danger should now counsel capture of all the remaining birds is not only unexplained by the record, but appears to be contradicted by it. Plaintiff has thus made a strong showing that it is likely to prevail on the merits.

**NEPA Claims**

Even in light of the observation that plaintiff has made a preliminary showing that FWS' actions were arbitrary and capricious, it is nonetheless appropriate to consider the question of whether the defendants should have analyzed and considered different courses of action under NEPA. If this is so, additional grounds for relief may be available to Audubon.

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), mandates that proposals for "major federal actions significantly affecting the quality of the human environment" must be accompanied by a detailed Environmental Impact Statement (EIS"). All federal actions involving "unresolved conflicts concerning alternative uses of available resources" must be preceded by an agency effort to develop alternatives, NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(E). In December 1985 FWS circumvented compliance with these requirements, claiming that the Condor capture and removal decision was exempt as an "emergency" action and that the effects of the program would not be "significant." FWS also ignored alternatives that could have preserved the wild Condor population. In departing from its longstanding policy and to avoid compliance with NEPA, FWS advised the Council on Environmental Quality ("CEQ") that im-

mediate removal of the Condors was necessary to avoid jeopardy to the continued survival of the species.

Plaintiff points out, however, that the only document explaining the claim to an emergency exemption from NEPA is a letter from the CEQ general counsel to Mr. Hester, stating in part that "[FWS] views this action as an emergency due to the precipitous decline in the number of Condors in the past year (6 Condors have been lost from the wild population)." A.R. 82. This, however, is a questionable basis for the finding of an "emergency." The 6 Condors referred to were lost during the winter of 1984–85 and more than eight months before the declaration of the emergency. As noted, the record is very sparse and limited in supporting FWS' assertions and, consequently, the claim of an emergency exemption is suspect. An agency must comply with NEPA requirements "to the fullest extent possible," 42 U.S.C. § 4332, and claimed exemptions should be narrowly construed. *See Calvert Cliffs Coordinating Committee v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1115 (D.C.Cir.1971).

In *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C.Cir.1983), our Circuit Court held that NEPA required an agency to prepare an EIS "[i]f *any* 'significant' environmental impacts might result from the proposed agency action...." *Id.* at 1415 (emphasis in original). In reviewing an agency decision to forego preparation of the EIS, the court suggested that areas of inquiry should focus on: whether the agency took a hard look at the problem and identified the relevant areas of environmental concern; whether in doing so the agency made a convincing case that the impact was insignificant; and if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum. *Id.* at 1413.

Plaintiff argues that the FWS analysis of December 1985 falls far short of the *Peterson* standards. The Court agrees. For example, FWS never countered the argument that removal of the birds from the

wild poses a serious threat to survival and recovery of the species, arising from the likely loss of important Condor habitat as well as from the loss of "guide birds." The September 1985 EA lists those general concerns in a cursory fashion, concluding that the removal of the birds could not be justified. However, subsequent addenda to the EA, intended to justify the decision to remove the birds, simply do not reveal that FWS took a hard look at the problem and made a convincing showing that the impact of removing all the birds was insignificant.

Finally, the record does not clearly demonstrate that there was a meaningful consideration and discussion of alternatives to capture. NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(E), requires all federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]" The consideration of such alternatives is independent of the duty to file an EIS. *Trinity Episcopal School Corp. v. Romney*, 523 F.2d 88, 93 (2d Cir.1975). When no EIS is prepared, the analysis should be presented in the EA. 40 C.F.R. 1508.9(b). The scope of the duty is the same whether undertaken in an EIS or an EA: "no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir.1974). Several possible alternatives designed to preserve the wild Condor population were available, but there is no showing that they were carefully considered.

## B.

### HARM TO THE RESPECTIVE PARTIES

It is somewhat difficult to speak of harm either to NAS or to defendants, for each of the parties is concerned with one thing—the protection of the species, especially as it exists in the wild. What divides the parties is the way in which each views its mission. NAS is concerned lest the survivability of the wild population be extinguished by act of man, by the capture of the remaining birds. FWS believes, on the other hand, that if left out in the wild, the remaining birds will die of unknown causes.

Yet the balance of harm as between the parties has already been determined. The harm that FWS views as likely to befall the wild population was already considered in the September EA. In that document, FWS determined that the possibility of increased mortality was outweighed by the danger to the Recovery Program posed by capture of all the birds. Specifically, FWS feared that such capture (1) would eliminate the benefits of further habitat studies; (2) would likely lessen future habitat protections; and (3) would remove all potential guidebirds from the wild, thus lessening the likelihood that captive Condors could ever be successfully released back into their natural environment. A.R. 57, attach. FWS was willing to risk the possible death of one or more of the birds left in the wild. A.R. 54, 45 at 6. No new factors have been brought to the Court's attention that would justify overturning the balance previously reached by FWS.

The Court notes, also, that of the six birds that died during the winter of 1984–85, five were not wearing functioning radio transmitters. Stipulation No. 5. Of the five birds now in the wild, four are wearing transmitters. Stipulation No. 7. With careful monitoring and a program of providing the birds leadfree[5] carcasses upon which to feed, the possible harm to the remaining birds if left in the wild is even more outweighed by the possible damage, previously identified by FWS, to the Recovery Program from their capture.

---

5. It is believed that the birds become poisoned by ingesting lead from the carcasses of animals killed by hunters. Stipulation No. 8. Accordingly, the Condor Research Center in California began, in the spring of 1985, a daily feeding program whereby "clean" carcasses are put out for the birds. Stipulations Nos. 8, 9.

## C.

### THE PUBLIC INTEREST

The protection of the Condor population is, of course, a matter of public interest. *See Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978). The furtherance of that public interest, in turn, has been delegated by Congress to the Department of the Interior and specifically to FWS.

FWS has represented earnestly to the Court that the public interest now favors immediate capture of the birds. Certainly an agency is permitted to change its mind as to what course of action best serves the public interest. *Greater Boston T.V. Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Yet a change of course must follow a reasoned analysis; otherwise the agency ceases to perform its congressionally mandated role. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 57, 103 S.Ct. at 2874. To the extent that plaintiff has made a showing that FWS has acted arbitrarily or capriciously in carrying out its delegated duty, the public interest favors the issuance of an injunction.

### CONCLUSION

Based on the foregoing, the Court determines that the plaintiff has met the standards for awarding equitable relief and that its application for a preliminary injunction should be **granted.** An appropriate Order accompanies this Memorandum Opinion. The Court will also grant the plaintiff's motion for summary judgment supported by a Memorandum Opinion.