NATIONAL AUDUBON SOCIETY

v.

F. Eugene HESTER, Acting Director, U.S. Fish & Wildlife Service, et al., Appellants.

No. 86–5086.

United States Court of Appeals, District of Columbia Circuit.

Argued May 30, 1986.

Decided June 10, 1986.

Opinion Sept. 5, 1986.

Karen Florini, with whom Peter R. Steenland and Donald A. Carr, Dept. of Justice, were on the brief, for appellants.

William A. Butler, with whom Hope M. Babcock, Kenneth Berlin, and Edward P. Gerwin, Jr., were on the brief, for appellees.

Eldon V.C. Greenberg was on the brief, for Greater Los Angeles Zoo Assn., amicus curiae, urging reversal.

Denis D. Smaage was on the brief, for California Fish and Game Com'n., amicus curiae, urging reversal.

Before EDWARDS, STARR and SILBERMAN, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

The California condor, the largest winged inhabitant of North America, has been decimated to the point where only twenty-six members of the species remain in existence. At the time this controversy began, all but six of the birds were kept in zoos in Los Angeles and San Diego as part of a breeding program designed to avert extinction of the species. This lawsuit arises from the U.S. Fish & Wildlife Service's decision to bring the remaining con-

dors in from the wild. The district court granted plaintiff National Audubon Society's request for a preliminary injunction barring the Service from carrying out this decision, 627 F.Supp. 1419. Because we believe that the agency's decision constituted a reasoned exercise of its discretion in fulfilling its statutory mandate, we reverse.

## I.

In recent years, the Wildlife Service's energies have been engaged in inauspicious efforts to stem the condor flock's steady decline. In 1979, working in tandem with public and private groups (including the plaintiff), the Service developed a "Condor Recovery Plan." This plan had two principal elements: extensive tracking and study of wild birds, and the commencement of a captive propagation program. At the time, it was hoped that better information about the birds' lifestyle (and causes of death), together with enhanced breeding in capacity, could save the condor. The mortality rate among wild birds, however, proved to be alarming: in the winter of 1984–85, six of the then fifteen wild condors vanished. A common cause of death was believed to be lead poisoning following the birds' feeding on the carcasses of animals shot by hunters (the condor is a member of the vulture family).

After considering a wide range of scientific opinion, the Wildlife Service issued an Environmental Assessment in October, 1985 setting forth seven alternative courses of action for condor preservation. The option chosen by the agency combined capture of birds whose genes were poorly represented among the captive flock, maintenance of a small wild flock, and eventual release of young birds bred in captivity. This choice struck a balance between the competing considerations at stake (as well as the contending views of biologists and naturalists): on the one hand, bringing in the remaining wild condors would minimize

mortality and increase the genetic diversity of the captive flock; on the other hand, preservation of a wild flock would provide "guide birds" available to lead captive-bred condors ultimately released, facilitate the improvement of techniques of protecting the birds, and prevent the erosion of public support for preserving the condors' habitat.

Shortly after this report was released, however, troubling news began reaching the Wildlife Service. One of the birds scheduled to remain in the wild appeared to be courting one of the birds slated for capture. Second, due to apparent zoo mismanagement, the young condors selected for release into the wilderness in the next year had grown too tame. And, most importantly, one condor inhabiting an area regarded as very safe, where "clean" carcasses were provided for the birds, nonetheless came down with lead poisoning (and has since died). In late December, the agency reversed its earlier decision and announced that all remaining wild birds would now be brought in. The federal Council on Environmental Quality certified that an emergency existed and that immediate documentation of the environmental effects of this decision was unnecessary. In any event, on December 23 the Service issued an "Addendum" to its October Environmental Assessment explaining the reasons why the agency now believed a different plan of action was called for.

This lawsuit followed. Audubon claimed that the Wildlife Service's action violated the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* (1982), the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.* (1982), and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (1982), and moved for a preliminary injunction barring the capture of the wild condors. The district court granted Audubon's motion, finding that the plaintiff had demonstrated a likelihood of success on the merits[1] and a balance of

---

**1.** In fact, the court apparently found more than a likelihood; it stated in its opinion that it would subsequently grant the plaintiffs' motion

for summary judgment as well. No opinion has yet issued on that matter.

hardships in its favor. *See* 627 F.Supp. 1419 (D.D.C.1986). While acknowledging that a "reviewing court must be wary of substituting its own judgment for that of the agency," *id.* at 1422 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)), the district court nevertheless concluded that the agency's decision was fatally flawed. The court opined that the Wildlife Service had exhibited insufficient analysis and explanation of its departure from past policy. In the court's view, this change of policy amounted to arbitrary and capricious action in violation of the above-mentioned statutes and threatened irreparably to harm the plaintiff's interests.[2]

## II.

■ This court customarily reviews a district court's grant of preliminary equitable relief under the deferential abuse of discretion standard. *See Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 151 (1985). A preliminary injunction premised upon an erroneous view of the law, however, is not insulated from appellate review. *See id.* at 151–52; *White House Vigil for ERA Comm. v. Watt,* 717 F.2d 568, 571 (D.C.Cir.1983) (*per curiam*); *Ambach v. Bell,* 686 F.2d 974, 979–80 (D.C.Cir. 1982) (*per curiam*). In this case, the district court's decision appears to have rested entirely on its view that the Wildlife Service had failed to justify its change of policy; the court relied upon this point not only in determining the plaintiff's likelihood of success on the merits, but also in concluding that the "balance of harms" favored Audubon. Since we believe, contrary to the district court, that the agency fully considered all appropriate courses of action and adequately explained its policy choice, we cannot uphold the district court's decision.

Although the district court relied upon the ESA and NEPA as well as the Administrative Procedure Act, it is clear that those statutes essentially place the same demands on agency decisionmakers as does the APA. *See Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 684–86 (D.C.Cir.1982). Under the ESA, an agency's determination that its action will not threaten endangered species is to be set aside only if arbitrary and capricious. *See id.* at 686. Under NEPA, agencies must prepare an Environmental Impact Statement (EIS) whenever proposed major federal action will significantly affect the quality of the human environment, *see* 42 U.S.C. § 4332(2)(C) (1982); an agency's decision *not* to prepare an EIS—because the proposed action will not significantly affect the environment—may be overturned, again, only if arbitrary and capricious. *See Sierra Club v. Peterson,* 717 F.2d 1409, 1413 (D.C.Cir.1983); *Cabinet Mountains Wilderness,* 685 F.2d at 684; *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002 (D.C.Cir.1979) (*per curiam*), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). The question for reviewing courts is not whether an agency decision is "correct," but rather whether the decision reflects sufficient attention to environmental concerns and is adequately reasoned and explained. *See Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1983); *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The ESA and NEPA were intended to ensure that agencies, in discharging their various functions, do not blithely disregard the environmental effects of their decisions; it is obvious, then, that judicial review of agency decisionmaking is at its most deferential where, as here, the agency action is based

---

**2.** So far as the record discloses, it appears that Audubon has standing to maintain this action. The organization's activities in observing and studying wild condors may be set back by the agency's action, and these activities are within

the "zone of interests" protected by the ESA and NEPA. *See Japan Whaling Ass'n v. American Cetacean Soc'y,* —— U.S. ——, ——, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986).

*solely* upon environmental considerations—where the challenge to agency action simply represents a quarrel with the agency's means of pursuing a universally desired end.

We believe the Wildlife Service's decision to capture the remaining wild condors was manifestly defensible. That decision represented a reevaluation by the responsible agency of the costs and benefits associated with the existence of captive and wild condor flocks. Contrary to the plaintiff's assertion, the decision was not markedly at odds with previous policy. In its October Environmental Assessment, while endorsing the maintenance of a small wild flock, the Service had recognized that there were weighty arguments to the contrary and that the question was close; it noted that "if the condor population appears to continue steadily downward after implementation of this option, we stand ready to reevaluate the taking into captivity of all, or a significant portion of, the remaining [wild] population." This is, in part, precisely what happened: the agency reconsidered its policy after learning of recent developments, including the lead poisoning suffered by a bird inhabiting what was thought to be one of the safest locations. The Wildlife Service simply exercised its discretion to "adapt [its] rules and policies to the demands of changing circumstances." *Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312 (1968). The district court, however, concluded that the factual developments supporting the agency's change of course were not "new"—that they had been known at an earlier stage, when the agency reaffirmed its commitment to preserving a wild flock. The flaw in this reasoning is that in a case like this one there is no particular significance attached to the ex-

act date that factual information reaches any official of an agency. It takes time for information to be disseminated from the lower echelons of agency staff to the agency's decisionmakers, and still more time for the decisionmakers to appraise the policy implications of that information.

More fundamentally, agencies are entitled to alter their policies " 'with *or without* a change in circumstances,' " so long as they satisfactorily explain why they have done so. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2873, 77 L.Ed.2d 443 (1983) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)) (emphasis added). We have little problem concluding that the Wildlife Service met its burden of justifying its change of course. The agency's October Environmental Assessment thoroughly surveyed the competing factors at stake and examined the desirability of seven alternative courses of action. Its December Addendum incorporated the earlier document's reasoning and additionally set forth the agency's reasons for preferring a different option than before.[3] The Service's documentation may have been succinct, but nonetheless adequately discloses the concerns underlying the agency's decision and demonstrates that that decision rests on a rational basis. That much being so, our inquiry is at an end: NEPA's "mandate to the agencies is essentially procedural.... It is to insure a fully informed and well-considered decision, not necessarily a decision [federal judges] would have reached had they been members of the decisionmaking unit of the agency." *Vermont Yankee Nuclear Power Co. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (citations

---

**3.** In any event, the Council on Environmental Quality had certified that, due to the urgent nature of the Wildlife Service's concerns with condor mortality, immediate recording of the agency's reasons why it now preferred another of the alternative courses of action discussed in the Environmental Assessment was not required

by NEPA. Since "CEQ's interpretation of NEPA is entitled to substantial deference," *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), we think the district court erred in deciding *itself* that no emergency existed that would excuse NEPA documentation.

omitted). The decision of the district court is therefore

*Reversed.*