**EARTH ISLAND INSTITUTE etc. et al., Plaintiffs,**

**v.**

**Warren CHRISTOPHER etc. et al., Defendants.**

**Slip Op. 96–188.**
**Court No. 94–06–00321.**

United States Court of International Trade.

Nov. 25, 1996.

Legal Strategies Group (Joshua R. Floum) for the plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division (Jeffrey M. Telep) and Environment & Natural Resources Division (Eileen Sobeck and Christiana P. Perry), U.S. Department of Justice; and Office of the Legal Adviser, U.S. Department of State (David Balton) and Office of General Counsel, National Oceanic and Atmospheric Administration (Jason Patlis), of counsel, for the defendants.

Garvey, Schubert & Barer (Eldon V.C. Greenberg) for the intervenor-defendant.

*Memorandum & Order*

AQUILINO, Judge:

Almost seven years after enactment of Pub.L. No. 101–162, § 609, 103 Stat. 988, 1037–38, 16 U.S.C. § 1537 note (1989), one year after the court opined herein per slip op. 95–208, 19 CIT ——, 913 F.Supp. 559 (1995), that this statute had to be enforced as Congress has intended, nine months after the

defendants and intervenor-defendant noticed appeals therefrom (later abandoned) and two hundred days after denial of any further delay and entry of final judgment in accordance with slip ops. 95–208 and 96–62, 20 CIT ——, 922 F.Supp. 616 (1996), those parties reappeared with new notices of appeal to the U.S. Court of Appeals for the Federal Circuit, Nos. 97–1085, 97–1086, and also with motions styled as for stays pending final resolution thereof.

I

The purported cause of this reappearance is the court's attempt at clarification of the embargo mandated by Congress in the foregoing statute, as affirmed in the final judgment of April 10, 1996. *See* Slip Op. 96–165, 20 CIT ——, 942 F.Supp. 597 (Oct. 8, 1996). That opinion, familiarity with which is presumed, was necessitated by seeming misinterpretation on the part of the defendants. Nonetheless, they now demand that

> the injunction contained in this Court's order dated October 8, 1996 ... [be] stayed pending issuance of the mandate of the ... Court of Appeals ... in the appeal of this matter[,]

to quote from their proposed form of order, while that of the intervenor-defendant posits a stay of the clarification

> insofar as it requires the imposition of embargoes against all "shrimp or products of shrimp harvested in the wild by citizens or vessels of nations which have not been certified in accordance with Pub.L. No. 101–162, § 609(b)(2)".....

In handing down slip op. 95–208 on December 29, 1995, the court afforded the defendants a total of five months within which to attempt to implement the dictate of the statute world-wide and report thereon. *See* 19 CIT at ——, 913 F.Supp. at 580. They

responded with a motion for an across-the-board, additional one-year extension of time to prohibit importation of shrimp or products from shrimp upon the condition Congress had prescribed years ago. The support offered was paltry[1], whereupon the court decided to accelerate entry of final judgment to enable the defendants and intervenor-defendant to obtain appellate review if that was genuinely their intent. *See* 20 CIT at ——, 922 F.Supp. at 626. Apparently it was not, for not only did the defendants and intervenor-defendant not appeal the April 10, 1996 final judgment in a timely manner, their prior appeals were subsequently ordered dismissed. *See* 86 F.3d 1178 (Fed.Cir.1996). Instead, according to the plaintiffs, the government revised its approach to enforcement of the embargo (and final judgment) in such a manner[2] as to eviscerate the goal of Congress in enacting section 609. The plaintiffs condemned this approach as "dangerous" and "disingenuous" because it

> eliminates any incentive for countries to put TEDs on more than a handful of nets. Countries can evade the Law's embargo by exporting to the United States those shrimp caught by a few designated vessels which are equipped with TEDs, while exporting elsewhere shrimp caught by those which are not. This eviscerates *both* of Congress' purposes in enacting the Turtle Law. It fails to create the level playing field which Congress undeniably sought for the U.S. fleet, which is required to put TEDs on *each and every* vessel. It also guts the Law's objective of protecting these endangered species—for substantial portions of the shrimping fleets of exporting nations may now eschew TEDs with impunity.[3]

The court could not and therefore did not

---

**1.** *See* transcript of proceedings on March 26, 1996 and Slip Op. 96–62 *passim.*

**2.** *See generally* Dep't of State, *Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations,* 61 Fed.Reg. 17,342 (April 19, 1996); Dep't of State, *Bureau of Oceans and Int'l Environmental and Scientific Affairs; Certifications Pursuant to Section 609 of*

*Public Law 101–162,* 61 Fed.Reg. 24,998 (May 17, 1996).

**3.** Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Enforce Judgment, p. 3 (emphasis in original).

The acronym "TEDs" refers to various turtle excluder devices. *See generally* 19 CIT at —— and 913 F.Supp. at 563, n. 1 and references therein.

find otherwise.[4] Rather, it reaffirmed its prior slip ops. 95–208 and 96–62 to the effect that the embargo enacted by Congress in section 609(b), 103 Stat. at 1038, 16 U.S.C. § 1537 note, may not be enforced by the defendants in a manner contrary to subsection (b)(2) thereof. *See* Slip Op. 96–165 at 48.

Despite this fundamental statutory provision, which should not have engendered further discussion in this protracted litigation, counsel for the defendants and intervenor-defendant precipitated an immediate conference with the court to query the absence of the words "in the wild" in that reaffirmation.

Among other things, the final judgment orders the defendants to

prohibit not later than May 1, 1996 the importation of shrimp or products from shrimp wherever harvested in the wild with commercial fishing technology which may affect adversely those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987, 52 Fed.Reg. 24,244, except as provided in Pub.L. No. 101–162, § 609(b)(2), 103 Stat. 1038, 16 U.S.C. § 1537 note.

As if this injunction, which was not appealed, were not clear enough, the court determined to repeat its in-the-wild condition in slip op. 96–165 by way of an *Erratum* issued October 10, 1996. Be that as it may, the intervenor-defendant now contends that slip op. 95–208 and this judgment "properly recognized the critical place of [section 609(b)(1)] language in the statutory scheme", but "in its October 8 ruling ... the Court has read the operative language of Section 609(b)(1) out of the Act." Memorandum of Defendant–Intervenor, p. 7. *See also* Defendants' Motion for Stay, p. 16. Of course, the court could not, and therefore did not, do so. To repeat, slip op. 96–165 only attempted to clarify the contingent requirement of section 609(b)(2) contained in the statute and judgment.

Notwithstanding that certification in accordance with section 609(b)(2) is the only statutory ground for avoidance of the embargo mandated by subsection (b)(1), that the government had enforced the statute on this basis prior to May 1996, albeit restricted to nations of the "wider Caribbean", and that the Acting Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs declared in July 1996 in this case that the

Department of State now considers *all* shrimp harvesting nations for possible certification under that statute, not just the 14 nations in the Wider Caribbean Region that had previously been subject to the certification requirement. *All* shrimp harvesting nations that are not certified are, as of May 1, 1996, under an embargo on the importation of their shrimp and shrimp products, in accordance with Section 609(b)(1)[,[5]]

the Department's post-judgment guidelines cited above and discussed in slip op. 96–165 offer breach of the embargo on a shipment-by-shipment basis. *See generally* Slip Op. 96–165 at 2–19.

### A

■ Comes now the Under Secretary of State for Economic, Business and Agricultural Affairs with a declaration in support of defendants' motion for a stay based essentially on two points, to wit:

First, the Court Order places in jeopardy a newly concluded treaty to protect sea turtles in the Western Hemisphere. Difficult negotiations towards such a treaty had been underway for more than two years. On September 5, 1996, those negotiations successfully concluded with the adoption of a proposed treaty, entitled "The Inter–American Convention to Protect and Conserve Sea Turtles" ....

\*      \*      \*

---

**4.** *See* Slip Op. 96–165 at 16–17. At a hearing on July 25, 1996 on the motion brought by the plaintiffs to enforce the court's final judgment, both sides were afforded until September 30, 1996 to discover and/or present relevant facts. No one did so by that deadline.

**5.** Declaration of David A. Colson, para. 2, p. 2 (July 1996) (emphasis in original). *See also id.,* para. 11, p. 7.

Second, the Administration is especially concerned that the Court Order, if not stayed, will provoke a backlash among governments of Southeast Asian nations that have been making significant strides in recent months to acquire TEDs technology and to adopt TEDs programs. The Administration has persuaded these governments, whose industries provide a majority of U.S. shrimp imports, to move toward TEDs usage in part by making clear to them that, until they are certified under Section 609, individual shipments of TED-caught shrimp, and other shrimp harvested in ways not harmful to turtles, could enter the U.S. market. The Court Order overturns this approach and, we fear, will undercut the progress of these nations toward TEDs usage.

Declaration of Joan E. Spero, paras. 4, 7 (Oct. 18, 1996).

With regard to the first claimed concern, if the negotiations toward The Inter-American Convention for the Protection and Conservation of Sea Turtles have indeed been "difficult" over the last two years and placed in jeopardy by this case as alleged during that same period, now is the first mention of the matter on this record. Certainly, the government had ample opportunity to do so earlier. Perhaps the reason it did not is due to the fact that "the proposed treaty recognizes that sea turtle species have become endangered as a result of a wide range of causes"[6], not "only . . . the problem of sea turtle mortality caused by commercial shrimp trawl fishing". *Id.*, para. 5, p. 3. After reading a draft of the treaty, the court concurs in this assessment. Curiously, neither the draft nor the Secretary indicates which nations in the western hemisphere are potential signatories. The court is thus left

to note in passing that most of the littoral countries on this side of the globe have already been certified under section 609(b)(2) [7], thereby presumably not seriously affecting their attitudes toward the new treaty, which has been negotiated entirely during the time of this embargo provision.

As for the second stated concern over "backlash among governments of Southeast Asian nations", to the extent such has been their response, it predates October 8, 1996. *See, e.g.,* Slip Op. 96–165, p. 18, n. 14; *Four Asian Nations Ask United States for WTO Consultations on Shrimp Ban,* 13 Int'l Trade Rep. (BNA) 1593; Declaration of Joan E. Spero, para. 12; *Court Ruling Strengthens Enforcement of Shrimp Embargo,* 96–42 Int'l Trade Alert, p. 2. Be that as it may, of course good relations with those sovereigns are important at any time, and the Secretary refers to recent U.S. attempts to advance them with Thailand, India and the People's Republic of China in particular. But this country's government must also always abide its own laws, just as the governments in those lands might be presumed to do. That their perceptions or lawful interests may digress from those of the United States should not be reason to unlawfully abrogate this country's enacted approach. As pointed out repeatedly herein, this Court of International Trade is not the proper forum for foreign accommodation or circumvention. With regard to any plea in the World Trade Organization, the evidence at bar shows, for example, that Thailand is by far the largest exporter of shrimp to the United States, that the lion's share of its exports are not subject to the embargo [8] and that, according to the plaintiffs, the defendants have now certified that nation as in compliance with section 609 [9]. Moreover, even if it or other would-be Geneva com-

---

**6.** Declaration of Joan E. Spero, para. 5, p. 3 (Oct. 18, 1996).

**7.** The names of those nations are set forth in the State Department's notice of May 17, 1996, 61 Fed.Reg. at 24,999, which is quoted in slip op. 96–165 at pages 4–5. *See also* Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Response to Plaintiffs' Motion for Summary Judgment, Exhibit 1 (1991), Exhibit 2 (1992), Exhibit 3 (1993), Exhibit 4 (1994), Exhibit 5 (1995).

**8.** *Compare* U.S. Dep't of Commerce, *Fisheries of the United States, 1995,* p. 56 (July 1996) *with* Declaration of Joan E. Spero, para. 9, p. 6 *and* the text of the court's judgment, *supra.*

**9.** *See* Declaration of Todd Steiner in Support of Plaintiffs' Opposition to Defendants' Motion for a Stay, para. 12, p. 6 (Nov. 11, 1996).

plainants were not to adopt regulatory programs governing the incidental taking of sea turtles during shrimp harvesting which are comparable to that of the United States, a recent WTO panel has reaffirmed that domestic environmental concerns are of consequence so long as there is even-handed enforcement of the kind ordered in this case. *See United States—Standards for Reformulated and Conventional Gasoline,* parts VI(F), VII, WTO No. WY/DS2/R (Jan. 29, 1996).

As shown by this court's prior opinions, the government's domestic approach has been to require TEDs on all U.S. shrimp trawlers at all times. And, to quote from slip op. 96–165 at 18–19:

> To the extent that domestic comparator is an underpinning of the court's judgment, and has not been modified by the defendants, it restrains their immediate attempt at foreign accommodation, if not circumvention. The record, such as it still is, supports a finding that the requirement of TEDs on all vessels of a harvesting nation at all times results in a satisfactory rate of incidental taking of endangered species of sea turtles. In the absence of intelligence to the contrary, it remains *a fortiori* that requiring anything less than is comparable to the U.S. program violates section 609 and the court's judgment.

During the hearing which led to this opinion, as well as now in their motion for a stay, the defendants do admit to substantial revision of their approach, but with respect to shrimp from other countries, not yet certified in accordance with section 609. *See, e.g.,* Slip Op. 96–165 at 7; Defendants' Motion for Stay, p. 17, n. 10. They claim executive discretion to have done so, provided the reasons for such revision are explained satisfactorily, citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and *Nat'l Audubon Soc'y v. Hester,* 801 F.2d 405 (D.C.Cir.1986), for support.

Of course, the defendants are possessed of discretion, the reasoned exercise of which is entitled to deference, but those privileges do not extend to direct contravention of a mandate of Congress, affirmed by the judiciary.

The defendants argue that plaintiffs' motion to enforce

> brought before the court for adjudication for the first time legal issues that were not addressed in this [c]ourt's April 10, 1996[ ] decision underlying its earlier judgment and injunction. These new issues were created by the publication of the revised guidelines, which set forth State's newly promulgated method for applying Section 609(b) worldwide consistent with the court's determination that Section 609(b) must be applied worldwide. These issues were raised in what arguably should have been filed as an independent complaint, ... challenging an independent agency decision, and should have been afforded full adjudication.

Defendants' Motion for Stay, p. 11. They also point to a letter from plaintiffs' counsel to the court dated September 20, 1996, attempting to withdraw the motion to enforce, and thus contend that plaintiffs'

> abandonment of their claim for relief rendered moot the underlying case or controversy and mandated dismissal of their action. Accordingly, the Court's subsequent decision constituted an advisory opinion, which is prohibited by law.

*Id.* at 8.

The court considered plaintiffs' letter as an attempt to render moot the dearth of evidence produced in regard to the parties' divergent positions. That attempt to withdraw was denied because the court had come to conclude that plaintiffs' post-judgment position on the law of this case was correct, that is, that defendants' revised approach violates the crux of the law on its face. As was true in *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932), the government concedes that the court has inherent and continuing equity power to modify injunctions due to changed circumstances "if satisfied that what it has been doing has been turned through [those] circumstances into an instrument of wrong." *See id.,* n. 6. Surely, this authority cannot be divested simply by the object of the injunctive relief's embarking on a changed course at odds with a predicate of that relief. *Cf. United States v. The Hano-*

*ver Ins. Co.,* 18 CIT 991, 869 F.Supp. 950 (1994), *aff'd,* 82 F.3d 1052 (Fed.Cir.1996). Nor is the court without jurisdiction to act *sua sponte. See, e.g., Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir.1995), and cases cited therein.

The defendants refer to *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), to the effect that, when

> considering whether to grant a motion to enforce or modify an injunctive decree, a court is bound to identify the purpose of the original decree and to determine whether that purpose had been accomplished. Only if the initial purpose had been frustrated by continued non-compliance is a court obligated to impose more specific directives.

Defendants' Motion for Stay, p. 8. If this reference is intended to signify premature post-judgment reaction on the part of this court, it can be agreed that the embargo of Congress at bar is not of the same vintage as the Sherman Act injunction in *United Shoe* but also that the government has had more than enough time to fully effectuate section 609's remedy for reducing the killing of endangered species. The defendants also refer to "issues not before the court in the original proceeding" and "crafting a new injunction based on . . . new legal rulings". *Id.* That they have been self-induced is obvious, but it has not been clear to the court that defendants' "new issues" are for another action. On the contrary, the plaintiffs have complained herein from the beginning about the government's approach to foreign comparability under section 609(b)(2)(A) & (B). *See, e.g.,* 19 CIT at ——, 913 F.Supp. at 578–79. While the court sustained the position of the defendants on that issue, its decision thereon was as much a predicate of the final judgment as was the ruling on scope in favor of the plaintiffs. And neither element was susceptible to subsequent administrative revision without any further judicial review herein.

The guidelines published on April 19, 1996 report, in pertinent part:

> *Shrimp Harvested in a Manner Not Harmful to Sea Turtles.* The Department

of State has determined that import prohibitions imposed pursuant to Section 609 do not apply to shrimp or products of shrimp harvested under the following conditions, since such harvesting does not adversely affect sea turtles:

> a. Shrimp harvested in an aquaculture facility in which the shrimp spend at least 30 days in ponds prior to being harvested.

> b. Shrimp harvested by commercial shrimp trawl vessels using TEDs comparable in effectiveness to those required in the United States.

> c. Shrimp harvested exclusively by means that do not involve the retrieval of fishing nets by mechanical devices or by vessels using gear that, in accordance with the U.S. program described above, would not require TEDs.

> d. Species of shrimp, such as the pandalid species, harvested in areas in which sea turtles do not occur.

61 Fed.Reg. at 17,343. Whereas the focus of section 609 (and this case) has been on endangered species of sea turtles vis-à-vis other nations, these guidelines would seemingly switch the focus to the shrimp netted overseas for the American pocketbook and palate. While that phenomenon is the obvious cause of the continuing efforts to prolong this litigation, it cannot be determinative of the enforcement of the embargo in accordance with the law developed to date.

During their conference on October 10, 1996, counsel reminded the court of its acceptance of the earlier determination(s) of the Department of State that the embargo "does not apply to aquaculture shrimp, since the harvesting of such shrimp does not adversely affect sea turtles". 19 CIT at ——, 913 F.Supp. at 574, quoting *Turtles in Shrimp Trawl Fishing Operations Protection; Guidelines,* 56 Fed.Reg. 1,051 (Jan. 10, 1991), and *Revised Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations,* 58 Fed.Reg. 9,015 (Feb. 18, 1993). Indeed, in the absence of evidence on the record to the contrary, the court determined to restrict its final judgment to "shrimp wherever harvested in the wild" and,

upon the urging of defense counsel, to repeat this limitation in the order of October 8, 1996.

Counsel for the defendants and the intervenor-defendant also called upon the court to "clarify whether the artisanal method of harvest, which the State Department determined to be outside the scope of the embargo, w[as] covered by the injunction." Defendants Motion for Stay, p. 4, n. 5. It did not do so, whereupon, as quoted, they have renewed their request(s) in their instant motions. Just as the exemption for aquaculture is not new, neither is the exemption for shrimp harvested exclusively by means that do not involve the retrieval of fishing nets by mechanical means. *See, e.g.,* 58 Fed.Reg. at 9,017; 19 CIT at ——, 913 F.Supp. at 578 and n. 35. Both section 609 and the court's final judgment are activated by "commercial fishing technology which may affect adversely [endangered] species of sea turtles". Apparently, the defendants have not equated the "artisinal method of harvest" with such technology, and the court has had no basis to find otherwise on the record developed.

The attempt to make species of shrimp harvested in areas in which sea turtles do not occur an issue is another seeming red herring. Whether or not the plaintiffs consider the question an open matter [10], they have not presented evidence that harvesting in those areas endangers sea turtles. Some 15 nations have now been certified in accordance with section 609(b)(2)(C) and the court's final judgment as not posing a threat to the turtles of concern. *See* 61 Fed.Reg. at 24,999; Slip Op. 96–165 at 4. Presumably, that statutory provision is also the ground for defendants' certification of eight other nations, including several in the wider Caribbean, as using manual rather than mechanical means to retrieve their shrimp nets. *See* 61 Fed. Reg. at 24,999; Slip Op. 96–165 at 5.

### B

The defendants may consider their decision to permit entry of shrimp from nations not subject to certification under section 609(b)(2)(C) and not yet certified pursuant to subsections (A) and (B) to have engendered a genuine "new" issue of law, but, as discussed at length in slip op. 96–165 and referred to above, this court does not. Be that as it may, they (and the intervenor-defendant) claim to seek stays of that clarification of the April 10, 1996 final judgment while appealing the issue.

■ The defendants note that, in deciding a motion for a stay pursuant to CIT Rule 62(c), the factors to be considered are

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Defendants' Motion for Stay, p. 5, quoting *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987). In *Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 897 F.2d 511, 512 (Fed.Cir. 1990), the court, in relying on this traditional method of analysis, added that each factor "need not be given equal weight."

> ... When harm to [the] applicant is great enough, a court will not require "a strong showing" that [the] applicant is "likely to succeed on the merits" ... *provided* the other factors militate in [it]s favor.

897 F.2d at 513 (emphasis in original), citing *Hilton v. Braunskill, supra.* Whereupon, the defendants summarize their present position:

> ... Consequently, a stay is warranted so long as we present a serious legal question, when little harm would befall the other interested parties or the public, and when denial of the stay would inflict irreparable harm.

Defendants' Motion for Stay, p. 7.

The motion relies on the declaration of Secretary Spero for the proposition that the government will suffer immediate and irrepa-

---

**10.** *Compare* Defendants' Motion for Stay, p. 2, n. 2 *with* Reply Memorandum in Support of Plaintiffs' Motion to Enforce Judgment, p. 4, n. 3.

rable injury if a stay is denied. *See id.* at 22–23. Whatever harm the Secretary alludes to, essentially described in the two points quoted above, hardly appears either immediate or irreparable. Moreover, it pales in comparison with the damage Congress has concluded to attempt to prevent. To repeat yet again, the evidence in this case still indicates that

> more than 124,000 sea turtles drown annually due to shrimping by all other nations. This represents the death of more than 340 sea turtles every day when TEDs are not used.

19 CIT at ——, 913 F.Supp. at 568; 20 CIT at ——, 922 F.Supp. at 624. In response to the instant motions for stays, the plaintiffs have submitted a draft study by the government's National Marine Fisheries Service ("NMFS"), which estimates annual deaths of sea turtles caught in mechanized trawls by vessels of the following uncertified nations to be:

| | |
|---|---|
| Brazil | 2,352 |
| China | 1,176 |
| India | 6,209 |
| Philippines | 1,294 |

Declaration of Todd Steiner, para. 13. *See also id.,* Exhibit C. Presumably, it is this kind of evidence which caused Congress to act. And section 609 was presumably enacted in the public interest.

As indicated above, the main point of the defendants is that, since the plaintiffs sought to withdraw their motion to enforce, that should have been the end of the matter, whether or not the public interest is or has been affected and whether or not the mandate of Congress, as affirmed by the court, is being disregarded on its face. *See* Defendants' Motion for Stay, pp. 7–14. *See also* Memorandum of Defendant–Intervenor, pp. 5–6.

Whatever their primary thrust, counsel argue that the court

> need not agree with our arguments on the merits in order to stay its order. If agreement were required, no trial court ever would issue a stay pending appeal, effectively vitiating Rule 62(c).

Defendants' Motion for Stay, p. 6. Suffice it to report in this regard that just since the filing herein of the instant motions this court has granted the government stays pending appeals to the Federal Circuit in *Accutime Watch Corp. v. United States,* CIT No. 92–05–00334, *A Classic Time v. United States,* CIT No. 92–05–00349, *Alva Watch d/b/a Jordache Time Co. v. United States,* CIT No. 92–05–00336, *Anchor Time Corp. v. United States,* CIT No. 92–05–00333, *Baxter Healthcare Corp. v. United States,* CIT No. 95–01–00055, *Belfont Sales Corp. v. United States,* CIT No. 92–05–00326, *Branded Time Corp. v. United States,* CIT No. 92–05–00338, *Delta Impex Watch Corp. v. United States,* CIT No. 92–05–00335, *Delta Impex Watch Corp. v. United States,* CIT No. 92–11–00762, *Eastman Watch Co. v. United States,* CIT No. 92–05–00327, *F & K Watch Co. v. United States,* CIT No. 92–05–00348, *Grundig Electronic Corp. v. United States,* CIT No. 92–05–00337, and *World Forum Watches, Ltd. v. United States,* CIT No. 92–05–00350. To be sure, the facts and circumstances of those actions warrant that approach, but the court is unable to, and therefore does not, reach the same conclusion with regard to a stay in this case. The defendants do not make a strong showing that they are likely to succeed on either the procedural or substantive issues they posit, that they will be irreparably injured absent a stay or that the public interest lies on their side. Finally, in light of the record developed, it seems certain that grant of additional administrative delay in enforcement of section 609 can only make worse the matter Congress sought to address almost seven years ago. *See generally* Declarations of Dr. Peter C.H. Pritchard and Jack B. Woody in Support of Plaintiffs' Opposition to Defendants' Motion for a Stay Pending Appeal (Nov. 1996).

C

■ While the court must deny again any worldwide delay in enforcement of the embargo mandated by the statute, it also concludes in conformity with the prior decisions herein and the discussion in part I–A above that some of the scenarios outlined in the motions for stays are not subject to the embargo, namely:

The declaration of Secretary Spero, paragraph 11, refers to the situation in the People's Republic of China, in part, as follows:

> ... In a visit to Zhejiang Province in July, NMFS officials determined that virtually all wild-caught shrimp was harvested in that region with gear that does not harm sea turtles. Shrimp fishing vessels in that province use a type of "floating beam trawl" with an opening so small as to make the incidental capture of a sea turtle extraordinarily unlikely. Moreover, regulations in force in that province require shrimp fishermen to operate only in waters more than 40 meters deep, where it is virtually impossible to intercept a sea turtle with this gear. These regulations are strictly enforced....

The general manager of Ocean to Ocean Seafood Sales, a division of L.M. Sanders & Sons, Inc., declares, among other things:

> 2. The Company has historically purchased substantial quantities of wild-harvested shrimp from India and Pakistan.... To the best of my information and belief, all the wild-harvested shrimp purchased from India and Pakistan by the Company has been caught without the use of mechanized trawls. Since May 1996, such product has entered the United States accompanied by a Shrimp Exporter's/Importer's Declaration (Form DSP–121) attesting to its harvest using nonmechanical net retrieval.

Declaration of David Brockwell, para. 2.

The chief executive officer of King and Prince Seafood Corporation declares that it has contracts to purchase 858,000 pounds of shrimp from India (harvested with manually withdrawn nets) and 462,000 pounds of shrimp from China (also harvested with manually withdrawn nets). Declaration of Robert Brubaker, para. 2.

Both the president of Dynasea Corporation and the executive vice president of Red Chamber Co. indicate that the source of all or some of their respective shrimp supplies is Thailand. If plaintiffs' representation herein is correct, that nation is now certified under section 609, and none of its shrimp shipments is thus subject to the embargo. Furthermore, it is represented that the shrimp for which Dynasea has opened a letter of credit has been harvested in the wild by hand-retrieval gear. Declaration of Robert Hadeler, Jr., para. 2, p. 2. With regard to Red Chamber Co., it is added that approximately 60 percent (18 million pounds) of its frozen shrimp imports

> was wild harvested shrimp from India, Pakistan, China and Thailand which was either caught using non-mechanized trawls, caught by hand or caught in fresh water rivers.

Declaration of Ming Shou Kou, para. 5.

Declarations on behalf of Rich–Seapak Corporation, Sea Snack Foods, Inc., Amende & Schultz, Inc. and Ore–Cal Corporation represent that India is a source of their supply of shrimp harvested in the wild. To the extent that harvesting is accomplished by manual methods, as averred [11], the fruits thereof can continue to be imported by those four companies, despite the fact that India is not yet certified under section 609 [12].

### D

In its motion for leave to intervene on the side of the defendants, the National Fisheries Institute, Inc. ("NFI") was described as a national association with approximately 1,000 member companies involved in the fish and seafood industry in the United States, including producers, processors, wholesalers, distributors, retailers, brokers and importers. The organization's Vice President for Government Relations has sought to inform the court of the importance of imported shrimp to the entire U.S. seafood market and now to "estimate the impact of the shrimp embargo ordered by the Court on October 8, 1996." Declaration of Richard F. Gutting, Jr., para. 2 (Oct. 21, 1996). *Compare id. passim with* 19 CIT at ——, 913 F.Supp. at 570. Clearly, this latest declaration describes harm to NFI

---

**11.** *See* Declaration of Gary Kicklighter, para. 2, p. 2; Declaration of Fred W. Ockrim, para. 2; Declaration of Terry Schultz, para. 2, p. 2; Declaration of William Shinbane, para. 2.

**12.** The same holds for shipments to Rich–Seapak Corporation from China. *See* Declaration of Gary Kicklighter, para. 2, p. 2.

members, including those just named, if major shrimp supplier nations were to remain under the embargo. But this and other courts have held that economic harm is not necessarily irreparable, supporting grant of extraordinary equitable relief of the kind prayed for. *See, e.g., Sampson v. Murray,* 415 U.S. 61, 89–90, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1974); *Borey v. Nat'l Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991); *State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 290 (6th Cir.1987); *Bomont Industries v. United States,* 10 CIT 431, 638 F.Supp. 1334 (1986). Moreover, it must be presumed that NFI and other interested parties brought their concerns in this regard to the attention of Congress during its deliberations over the desirability and ramifications of enactment of the embargo.

█ In any event, the court cannot grant relief to the remaining NFI companies which have submitted declarations, namely, International Seafoods, Inc., Crystal Cove Seafood Corp. and Expack Seafood, Inc. Two represent that Brazil is a source of their supply of shrimp "caught in the wild by vessels using Turtle Excluder Devices comparable to those required in the United States." Declaration of Claude Schoeffer, para. 2, p. 2. *See* Declaration of Marvin Essrig, para. 2, p. 2. This may be true, but the government has considered Brazil to be within the wider Caribbean and thereby subject to section 609 from the beginning, yet that nation is not now certified. *Compare* Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Response to Plaintiffs' Motion for Summary Judgment, Exhibit 1 (1991), Exhibit 2 (1992), Exhibit 3 (1993), Exhibit 4 (1994), Exhibit 5 (1995) *with* 61 Fed.Reg. 24,998 (May 17, 1996). Certainly, Brazil has had ample opportunity to continue certified pursuant to section 609(b)(2).[13] As for Crystal Cove Seafood Corp., the declaration of its executive vice president lacks sufficient facts to enable the court to determine if the embargo applies.

13. *Cf.* State Dep't cables regarding Brazilian certification under section 609(b) (January—April

## II

In sum, the motions of the defendants and intervenor-defendant for relief pending their appeals are granted in part and denied in part in conformity with the foregoing.

So ordered.